# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION
### Case No. 17-cv-24127-DPG

NLG, LLC,

      Defendant/Appellant

v.

SELECTIVE ADVISORS GROUP, LLC,
LIZA HAZAN, A/K/A ELIZABETH HAZAN

      Plaintiffs/Appellees

_____/

## APPELLANT NLG LLC'S OPPOSITION RESPONSE TO RENEWED MOTION TO DISMISS APPEAL [ECF No. 36]

NLG, LLC ("NLG"), through undersigned counsel, files this Opposition Response to the Renewed Motion to Dismiss Appeal [ECF No. 36] (the "Motion") filed by the Debtor, Liza Hazan (the "Debtor") and Selective Advisors Group, LLC ("Selective"), and respectfully states:

1.    Even when it was contrary to its interests, NLG has consistently asserted that the Final Judgmen, entered by Judge Cristol on November 1, 2017, was a final appealable judgment. Appellees, on the other hand, have advocated inconsistent, and diametrically opposite positions.

1

2.     At the hearing on March 6, 2018 on NLG's Motion for Relief From Order Dismissing Appeal, the following exchange occurred on page 22 starting at line 7 (the full transcript is attached to this Reply as Exhibit 1):

> THE COURT: So, on that issue, is Judge Cristol's order a final, appealable order  anyway, as Mr. Dillworth questioned, or not?

> MR. LANGLEY: Two things, Judge. One is, it's too late for them to raise that issue, that's not -- it hasn't been raised at any point, at any time, in this whole discussion until Mr. Dillworth walked up to the microphone. Second, **it is final**. If you look at it, there is this issue of the lien that goes back 10 years, to a note and mortgage signed 10 years ago, that's been in litigation all of this time. Completely separate from that there were some tort claims, personally, against Mr. Kosachuk acting on behalf of NLG, for certain things that he's done in the past few years, completely separate from the lien issue. **The judge bifurcated the case because they were completely separate issues**, and we went to trial just on Counts 1, 2 and 3. And the Judge entered, clearly, a final judgment, resolved every issue, it cleared title to the property, it eliminated the note and mortgage, it found that -- by the way, it found that Selective is a creditor of NLG. And Selective certainly was not conferenced in, was not consulted, as far as letting Judge Ramirez file the appeal on behalf of NLG. Selective is a creditor as of this moment of NLG.

> THE COURT: So there's a subsequent-filed judgment after the final judgment at issue here?

> MR. LANGLEY: No. The November 1 final judgment ended all litigation concerning that issue and those parties and the lien issue. And we have researched that as well, Judge. **It's clearly a final judgment capable of being taken up on appeal.**

3.     NLG never disputed Mr. Langley's arguments on March 6, 2018, because it agreed with him.

2

4.     Appellees never raised this alleged issue that the November 1, 2017 Final Judgment was not final in their first Motion to Dismiss Appeal [ECF No. 6] because, as stated above, they researched that issue and determined that the Final Judgment was and is a final appealable judgment.   Their initial research was correct then and is correct now. The only reason they are arguing otherwise now is to further delay this appeal.

5.     In the often quoted words of the Supreme Court, a "final decision" is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Catlin v. United States*, 324 U.S. 229, 233 (1945).  This is precisely the case here.  Judge Cristol entered a Final Judgment on the core bankruptcy matters, ended the litigation on the core bankruptcy matters and simply has no jurisdiction to do anything further with the remaining counts, except to dismiss them. There is nothing further for the Bankruptcy Court to do, except enforce the Final Judgment.

6.     The Bankruptcy Court entered a final appealable judgment on all counts which went to trial and only on counts which the bankruptcy court had jurisdiction to hear; the core bankruptcy matters. The Final Judgment resolved all the issue which relate to the core bankruptcy matters, the Debtor's homestead and NLG's lien in the homestead as well as its claim in the bankruptcy.  The remaining counts have nothing to do with this issue and have no relation to the bankruptcy

whatsoever.  They raise issues between the debtor Hazan only and Chris Kosachuk personally, not NLG, which date back to 2008 and which were dismissed with prejudice almost ten years ago.  Selective has no interest in the remaining counts at all. In fact, since Judge Cristol entered his final judgment more than six months ago, debtor Hazan has done nothing to prosecute the remaining counts against Mr. Kosachuk, which will have to be adjudicated in a separate proceeding by a district court judge, not a bankruptcy judge.

7.     As Mr. Langley told this Court on March 6, 2018, Judge Cristol entered a Final Judgment on the core bankruptcy matters raised in the adversary hearing—the validity of the Final Judgment of Foreclosure entered by Circuit Judge Monica Gordo. This ended the litigation on the core bankruptcy matters. Judge Cristol simply has no jurisdiction to do anything further with the remaining counts because they constitute tort claims which NLG never consented to be tried by Judge Cristol.  That was the reason he bifurcated the remaining counts after he decided the issues raised in Counts I through III.

8.     In *Walden v. Walker (In re Walker)*, 515 F.3d 1204 (11th Cir. 2008), the Court stated: "In the bankruptcy context, this Court has concluded that 'it is generally the particular adversary proceeding or controversy that must have been finally resolved rather than the entire bankruptcy litigation.'" *Id.* at 1210 quoting from *Commodore Holdings, Inc. v. Exxon Mobil Corp.*, 331 F.3d 1257, 1259 (11th

4

Cir. 2003). The adversary proceeding in this case has been resolved by the Final Judgment under appeal.

9.      A single case can simultaneously contain an action brought by a trustee to recover property transferred by a debtor, a debtor's action objecting to a claim asserted by a creditor, and an adversary proceeding brought by or against the debtor involving a breach of contract. "Parties to these separate proceedings should not have to wait for the end of the entire bankruptcy proceeding before they can appeal." *In re James Wilson Assocs.*, 965 F.2d 160, 166 (7th Cir. 1992).

10.      Courts have adopted a broader approach in bankruptcy cases, explaining thusly:

> That broader approach to finality stems from the need to tie up the many subsidiary matters that litter the road to the distribution of assets in bankruptcy. A court cannot wait until the end of the case to allow the appeal, because final disposition in bankruptcy . . . depends on prior, authoritative disposition of subsidiary disputes.

*In re Gould*, 977 F.2d 1038, 1041 (7th Cir. 1992), quoting from *In re Kilgus,* 811 F.2d 1112, 1116 (7th Cir. 1987).

11.      The NLG Foreclosure Judgment not only instigated the bankruptcy filing (a day before the foreclosure sale), but also plays a crucial role in the Debtor's proposed plan of reorganization because she proposes a refinancing of the Fisher Island Property and to use those proceeds to fund the plan.  The plan can only proceed to the extent that NLG has no interest in the Fisher Island Property

5

and by using NLG's equity in the Property to secure other creditors.  As such this subsidiary matter must be finally resolved before the bankruptcy confirmation which is now scheduled for May 30, 2018. Obviously, the Debtor is trying to rush to confirmation, while simultaneously delaying the NLG adversary to the detriment of NLG.

12.    At the first confirmation hearing, on the latest filed plan and disclosure statement, on May 8, 2018 before Judge Cristol, Mr. Langley again argued extensively that Cristol Judgment is final in an attempt to persuade Judge Cristol to move forward with confirmation.   Judge Cristol was unmoved and stated: "We'll have to roll the confirmation". [*See May 8, 2018 Hearing Transcript* herein as Exhibit 2, page 14 line 7].  Attached hereto Exhibit 2, is the full hearing transcript.

13.    On page 11 starting on line 3 of the same transcript:

THE COURT: If the order [the November 1, 2017 Final Judgment] is -- if the District Court takes the matter up, then we have to wait and see what comes out of it. So as I said, I'm going to defer ruling on those three matters pending a report from the District Court as to how they're going to deal with it.

14.    Judge Cristol then reset confirmation hearing to May 30, 2018.  [*See May 8, 2018 Hearing Transcript* herein as Exhibit 2, page 20, line 16].

15.    Mr. Langley seems to argue whatever suits his need at the current instant.  Mr. Langley argued that the Cristol Judgment was final to this Court on March 6, 2018.   Then on April 18, 2018, Counsel Langley argued the exact

6

opposite to this Court that the Cristol Judgment was non-final.  On May 8, 2018, Counsel Langley flip-flopped again and argued to Judge Cristol that the November 1, 2017 Cristol Judgment was final in an attempt to proceed to confirmation. [*See May 8, 2018 Hearing Transcript* herein as Ex. 2 p. 5 line 25].

16.    Judge Cristol has reset the confirmation hearing to May 30, 2018 and is waiting for a ruling from this Court on the appeal. [*See May 8, 2018 Hearing Transcript* herein as Ex. 2 p.20 lines 16-17].

17.    The original adversary complaint was a two-count complaint, with core bankruptcy matters only; Count I; To determine the validity, priority and extent of NLG's lien and Count II; the avoidance of NLG's lien pursuant to 11 U.S.C. § 544.  The sole plaintiff was Selective and the sole defendant was NLG.

18.    The amended complaint included those two counts and a third count for quiet title.  Again all core bankruptcy matters.  It also added Liza Hazan as a co-plaintiff and still had NLG as the lone defendant.

19.    The Third Amended Complaint, which is the operative complaint in the matter, included six additional tort claims (non-core bankruptcy matters) and added Mr. Kosachuk as a defendant.  The remaining six counts are:

**COUNT IV.  INTENTIONAL TORT – Hazan v. Kosachuk;**

**COUNT V.  DEFAMATION – Hazan v. Kosachuk;**

**COUNT VI.  TRESPASS – Hazan v. Kosachuk;**

7

**COUNT VII. INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONSHIPS – Hazan v. Kosachuk;**

**COUNT VIII. INVASION OF PRIVACY – Hazan v. Kosachuk;**

**COUNT IX. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS – Hazan v. Kosachuk.**

20.     Also as noted above, the bankruptcy judge bifurcated the case into two separate cases:  the first on counts I, II and III (core bankruptcy case) and the second complaint on counts IV to IX (non-core bankruptcy case).  As such, the non-core case must be tried separately by a District Judge and not a Bankruptcy Judge, with a separate and distinct final judgment on the remaining counts in the event that the frivolous non-core claims survive a motion to dismiss and/or summary judgment.  This future judgment will have absolutely no effect on the Final Judgment being appealed herein.

21.     Counts IV to IX are non-core bankruptcy matters where the bankruptcy court does not have subject matter jurisdiction to hear and on which it cannot enter a final judgment.

22.     At the trial on July 13, 2017, all parties agreed to this bifurcation and the Court made clear its intention to have two separate cases, one on core bankruptcy matters and another on non-core matters.

THE COURT:  Be seated, please. Very well. During the noon recess, the Court has been reviewing the pleadings and notes that in the defendant's counterclaim, on Page 24 and 25 thereof, NLG does not consent to the entry of final orders or judgment by the Bankruptcy Court in the non-core matters raised in this

8

complaint. So that kind of separates Count 1, 2, and 3 from the remaining counts, 3 4, 5, 6, 7, 8, and 9. Under the circumstances, **I believe that it would be most prudent to go forward with the three counts on which this Court may enter final judgment**, and then reset the other counts for further trial if needed, following the conclusion of this trial. [*See* ECF No. 11-4 page 1274 starting on line 20]

As noted earlier, debtor Hazan has done nothing to "reset the other counts for further trial if needed."

23.    As such, the Bankruptcy Court did not make any findings pursuant to Rule 7054(b) because it did not have to as it was clear to the Bankruptcy Court and to all parties that the November 1, 2017 Cristol Judgment was a final and appealable judgment.

24.    NLG has filed a demand for jury trial on the remaining non-core matters, filed a Motion to Withdraw the Reference and designation of the record. [*See Selective Advisors Group, LLC and Liza Hazan v. NLG, LLC,* Case No. 16-ap-1439 ECF Nos. 267, 268 and 269].

25.    Federal Rule of Bankruptcy Procedure 7042 makes Federal Rule of Civil Procedure 42 applicable in adversary proceedings. Rule 42(b) provides:

> For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims. When ordering a separate trial, the court must preserve any federal right to a jury trial.

Fed. R. Civ. P. 42. "The decision to separate or bifurcate a trial is committed to the sound discretion of the trial court . . . ." *Farmers Co-op Co. v. Senske & Son*

*Transfer Co*., 572 F.3d 492, 498–99 (8th Cir. 2009); see also *State Bank of Florence v. Miller (In re Miller)*, 459 B.R. 657, 670 (B.A.P. 6th Cir. 2011), aff'd, 513 F. App'x 566 (6th Cir. 2013). Generally, the party seeking bifurcation has the burden of persuading the Court that bifurcation is warranted. E.g., *Dallas v. Goldberg*, 143 F. Supp. 2d 312, 315 (S.D.N.Y. 2001).   Hazan never filed an appeal or cross appeal challenging the bifurcation of Counts IV through IX.

26.    There is no benefit to the bankruptcy estate from these tort claims and Debtor Hazan has failed to even schedule them as assets of the bankruptcy estate.

**WHEREFORE**, for the reasons set forth above, NLG respectfully requests that the Court deny the Renewed Motion to Dismiss Appeal [ECF No. 36], order the Appellees to file their answer brief within 7 days or be precluded from doing so and grant such other and further relief as the Court deems appropriate.

May 14, 2018.

## <u>CERTIFICATION PURSUANT TO LOCAL RULE 2090-1(A)</u>

I hereby certify that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this court set forth in Local Rules 2090-1(A).

Respectfully submitted,

**Attorneys for Appellant NLG, LLC**

Juan Ramirez, Jr.
ADR Miami, LLC
Florida Bar No. 201952
ADR Miami LLC
1172 S. Dixie Hwy. #341
Coral Gables, FL 33146
(305) 667-6609
jr@adrmiami.com

Astrid E. Gabbe
The Law Office of Astrid E. Gabbe, P.A.
Florida Bar No. 635383
P.O. Box 4216
Hollywood, FL 33083
Tel. (954) 303-9882
Fax. (954) 983-1427
astridgabbe@gmail.com

11

# EXHIBIT 1

*NLG, LLC v. Selective Advisors Group, LLC and Liza Hazan*

Case No. 17-cv-24127-DPG

March 6, 2018 Hearing Transcript

```
 1                  UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2                        MIAMI DIVISION
                    CASE NO. 1:17-CV-24127-DPG
 3

 4   NLG, LLC
                Defendant/Appellant      Miami, Florida
 5
           vs.                           March 6, 2018
 6                                       Tuesday

 7   LIZA HAZAN A/K/A ELIZABETH HAZAN    Scheduled for 10:00 a.m.
     AND SELECTIVE ADVISORS GROUP, LLC   10:30 a.m. to 11:24 a.m.
 8
                Plaintiffs/Appellees     Pages 1 - 47
 9
     -----------------------------------------------------------
10

11                        MOTION HEARING

12            (NLG's MOTION FOR RELIEF FROM ORDER
              DISMISSING APPEAL AND FOR REINSTATEMENT)
13
                  BEFORE THE HONORABLE DARRIN P. GAYLES
14                  UNITED STATES DISTRICT JUDGE

15
     APPEARANCES:
16

17   FOR NLG, LLC:            JUAN RAMIREZ, ESQ.

18
     FOR LIZA HAZAN A/K/A     DAVID WILLIAM LANGLEY, ESQ.
19   ELIZABETH HAZAN:        David W. Langley
                             8551 West Sunrise Boulevard
20                           Suite 303
                             Plantation, Florida  33322
21

22   FOR SELECTIVE ADVISORS   JOEY MICHAEL GRANT, ESQ.
     GROUP, LLC              Marshall Socarras Grant, P.L.
23                           197 South Federal Highway
                             Suite 200
24                           Boca Raton, Florida  33432,

25
```

2

```
 1   ALSO PRESENT:

 2                  Chris Kosachuk, representative of NLG, LLC

 3                  Elizabeth Hazan a/k/a Liza Hazan, the Debtor

 4                  Sean Neil Meehan, Debtor's Husband

 5

 6

 7

 8

 9   STENOGRAPHICALLY
     REPORTED BY:          GLENDA M. POWERS, RPR, CRR, FPR
10                         Official Court Reporter
                           United States District Court
11                         400 North Miami Avenue, Room 08S33
                           Miami, Florida  33128
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                 (Call to the order of the Court:)

 2           COURTROOM DEPUTY:  All rise.

 3           THE COURT:  Please be seated.

 4           COURTROOM DEPUTY:  NLG, LLC, versus Selective Advisors

 5     Group, LLC, et al., Case Number 17-Civil-24127.

 6           Counsel, please make your appearances.

 7           MR. LANGLEY:  Good morning, Your Honor.  David Langley

 8     here representing Elizabeth Hazan, and Ms. Hazan is in the

 9     courtroom with us.

10           THE COURT:  Okay.

11           MR. GRANT:  Good morning, Your Honor.  Joe Grant.  I

12     represent Selective Advisors Group, and my client, Mr. Meehan,

13     representative for Selective, is also here.

14           THE COURT:  Okay.

15           MR. RAMIREZ:  Good morning.  Juan Ramirez on behalf of

16     NLG, LLC, and joining me is a member -- managing member here,

17     which is Chris Kosachuk.

18           THE COURT:  Okay.

19           MR. RAMIREZ:  Thank you.

20           MR. DILLWORTH:  Good morning, Judge Gayles.

21     Drew Dillworth.  I'm here pursuant to Your Honor's order.

22           THE COURT:  Okay.  All right.  Good morning, everyone.

23           So we are here on NLG's motion for relief from the

24     order dismissing appeal and for reinstatement.

25           And unless the state court has revisited that order
```

1    appointing Mr. Dillworth as receiver, I think you still speak

2    on behalf of NLG; is that not correct?

3         Why don't you come up to a microphone, please.

4         MR. DILLWORTH:  Thank you, Judge.

5         So, it's more complicated than that, in my view,

6    Your Honor.  And I put in the record a series of e-mails among

7    NLG's counsel, its principal, and myself that occurred right

8    around the Rosh Hashanah holiday concerning the underlying

9    receivership.

10        And if I could backup just a moment.

11        This is a state court receivership entered

12   post-judgment without a hearing issued --

13        THE COURT:  So how did you even come to be appointed?

14        MR. DILLWORTH:  I have no idea.  There was an ex parte

15   motion filed by the creditor that obtained a judgment.  And

16   incidentally, the creditor that obtained the judgment was

17   counsel of NLG in the bankruptcy case prior to Mr. Ramirez.

18        So there was no hearing.  The judge who entered the

19   receivership order was the very judge who issued the underlying

20   final judgment in the foreclosure proceeding that is now before

21   the Court.

22        THE COURT:  So you weren't contacted before you were

23   appointed?

24        MR. DILLWORTH:  I was not.  And that's happened to me

25   several times in this kind of context.  And so, what did I do?

1        Knowing that there was no hearing, knowing that the

2   very judge that issued the receivership order also issued the

3   underlying judgment that is now before the Court, and

4   understanding my role as the eyes and ears of the Court and not

5   wanting to do anything in connection with the pending

6   litigation to upset the applecart, if you will, I investigated

7   what the capital structure of NLG was -- because I wanted to

8   determine, is this the kind of case where there's a business

9   that needs to be saved?

10       Is this a kind of case where there's a whole lot of

11  activity that needs to happen immediately?

12       -- which you otherwise would determine from a court

13  record, an evidentiary proceeding that led to receivership.

14       And I quickly concluded that this was not that kind of

15  case.  I quickly concluded that the asset in question here --

16  the only asset that NLG has -- is the underlying final judgment

17  that's before the Court.

18       I determined that all the litigation that gave rise to

19  that judgment in state court and then all the litigation

20  challenging the judgment that's placed in the bankruptcy

21  court -- which is the record before the Court -- had already

22  concluded.

23       And I was immediately confronted with a party to the

24  case, meaning Equity, NLG, its former counsel saying, there was

25  no service -- not only was there no service of the receivership

1    order, but there was no service of the underlying complaint

2    giving rise to the judgment by default.

3         THE COURT:  You mean the complaint filed by Genovese

4    Joblove?

5         MR. DILLWORTH:  I apologize.  Yes, Your Honor.

6         Not knowing why -- all the questions Your Honor might

7    have today, it's hard to prepare, but -- so I'm just trying to

8    give you a stream of consciousness, so if I get it wrong,

9    please tell me if there's any ambiguity.

10        So when I realized that and I realized that the only

11   other creditors of NLG are the Genovese firm for the 40,000,

12   there is an unsatisfied judgment, I believe, that's of record

13   in Miami-Dade for about another hundred thousand, counsel --

14   that -- a former lawyer to NLG, and Mr. Ramirez, he has a claim

15   against NLG for his work, all of which totals roughly a half

16   million or less.

17        And I look at the size of the judgment and I see

18   someone attacking the underlying service of the complaint

19   giving rise to that judgment, which goes to the heart of the

20   state court's subject matter jurisdiction, who have not only

21   entered the judgment, but everything that rests upon it.

22        And having lived through a case that went to the

23   Eleventh Circuit, the Nica Holdings case, where my client

24   inherited in a bankruptcy case -- a bankruptcy case that he was

25   directed to administer -- but the authority to have filed it

1   was subject of challenge and, ultimately, never got resolved

2   until two years later, right.

3           In very underlying similar situation where the only

4   asset was litigation changes and having had all of that work in

5   that case being undone by the circuit -- because the subject

6   matter jurisdiction of the bankruptcy court was never

7   appropriate; and recognizing that the last thing, I think, the

8   state court judge, Judge Gordo, would have wanted to do was to

9   have me interfere in a matter that, effectively, was static,

10  again, there was nothing going on.

11          THE COURT:  So why didn't you go to Judge Gordo as the

12  receiver she appointed and say, Judge, there are issues

13  regarding service of the complaint filed by Genovese Joblove,

14  and there are, apparently, issues regarding my appointment for

15  which I actually never really agreed to do it -- I mean, why

16  didn't you go to her as her court-appointed receiver and tell

17  her that?

18          MR. DILLWORTH:  Respect, Your Honor.  Now, in a

19  different case, different facts, that's exactly what I would

20  have done.

21          THE COURT:  Well, you do understand --

22          MR. DILLWORTH:  I do understand.

23          THE COURT:  -- that had that been me, I would have been

24  furious at you for not coming to me to tell me that there were

25  these problems, because I would have appointed you as receiver.

1          Of course, I would have called you first and asked you

2     whether or not you wanted to be a receiver, but -- I mean,

3     you're experienced.

4          MR. DILLWORTH:  I am.

5          THE COURT:  You got to understand that you have to tell

6     the Court if there's a problem, if you are actually appointed

7     receiver.

8          MR. DILLWORTH:  I am, Your Honor.  And I would beg your

9     indulgence to at least understand my thinking, because,

10    obviously, this is what I do for a living.

11         But as I started with, each case is different, right,

12    and in this case there was nothing to do anyway.  The only

13    thing that I could have done -- which I actually started the

14    process of doing -- was to intervene in the bankruptcy court.

15         And if you look at what happened in the bankruptcy

16    court, I would have intervened only -- and not replaced

17    counsel -- that was because counsel, Mr. Ramirez, is familiar

18    with the record.

19         And then, in addition to that, you had -- and this

20    would have been an evidentiary hearing.  You had the NLG filing

21    a motion immediately, which is the condition upon which I said

22    I'd stand down, to have a hearing on the issue about the

23    Court's jurisdiction.

24         So, in my mind anyway, at that time there was nothing

25    more I really needed to do.  You had a creditor who had me

9

1    appointed agreeing that I could stand down, you had NLG filing

2    a motion to --

3         THE COURT:  Wait, wait a minute.

4         MR. DILLWORTH:  I'm sorry.

5         THE COURT:  You said the creditor who had been -- are

6    you talking about Genovese Joblove?

7         MR. DILLWORTH:  I apologize, I'm using pronouns.

8         THE COURT:  Use the names, please, sir.

9         MR. DILLWORTH:  Yes, sir.  The assignee of the Genovese

10   judgment did not oppose me standing down under the

11   circumstances.

12        NLG immediately in the state court filed a motion

13   attacking the underlying judgment and the jurisdiction that

14   entered the receivership order.

15        So, now, why that can't get heard over in state court

16   which requires an evidentiary hearing, I don't know.  It's

17   taking a long time.  I haven't been involved in the back and

18   forth between the Genovese judgment representative and NLG.

19        But when I saw that the motion was filed to undo the

20   underlying judgment upon which the receivership order rests, I

21   was very comfortable standing down because --

22        THE COURT:  What does that mean, exactly, "standing

23   down," in your mind?

24        MR. DILLWORTH:  In my mind, it meant doing nothing

25   further until the state court adjudicated the issue about the

1   validity of the judgment and the validity of the receivership

2   order.

3           Because, unlike some cases I've had over the 15, 20

4   years I've been doing this, there was some activity that needed

5   to be accomplished immediately.

6           And if this were that type of case, I would say to

7   you -- I would have been immediately back to Judge Gordo on

8   some kind of emergency hearing.

9           This was not that kind of case.

10          The only issue or the only asset I could identify that

11  NLG owns is the underlying judgment that Judge Gordo issued

12  that wasn't mentioned in the receivership order that I found

13  curious.

14          And then the only issue was the validity of that

15  judgment in the underlying bankruptcy case, a matter which had

16  already been adjudicated.

17          And so when I reached the agreement with NLG's

18  counsel -- whom I would have otherwise hired anyway, because

19  they already knew the record in both the state court and the

20  bankruptcy court.

21          When I reached that agreement to stand down -- at their

22  request, frankly, and which the Genovese judgment holder agreed

23  to -- it seemed to me the most appropriate action, given the

24  record before me.

25          And if the Court had time to hear the order -- I mean,

1    I'm sorry -- the motion upon which there has been a dispute,

2    which is the underlying service of the complaint, this would

3    have been resolved one way or the other.

4            THE COURT:  So that still has not been heard?

5            MR. DILLWORTH:  That still has not been heard, and so

6    I --

7            THE COURT:  Who is the judge now in that division?

8            MR. DILLWORTH:  It was Judge Gordo.  I'm not certain.

9    I think it might be Judge Ruiz.

10           MR. RAMIREZ:  Yes, it's Judge Ruiz, Your Honor, that

11   was part of the problem, that we were in the middle of the

12   transition from Judge Gordo to Judge Ruiz, and I had a lot of

13   trouble getting a hearing.

14           THE COURT:  Okay.  So let's just cut to the chase here.

15   Whether the wording is "stand down," or something else, did you

16   specifically authorize NLG's counsel to conduct this

17   litigation?

18           MR. DILLWORTH:  Was there -- the litigation in

19   bankruptcy court had concluded.  The first time I became aware

20   of the appeal, which would have been the only thing that I

21   would have been specifically asked to authorize, was after it

22   had been filed.

23           And there's no question in my mind of that because --

24   actually, the only thing I was surprised about -- which really

25   goes to the heart of Your Honor's question, the substance of

1    it -- the only thing that surprised me about the appeal was not

2    that it had been taken -- because, in my mind, the agreement to

3    stand down meant that NLG would continue to litigate; and I

4    think every step along the way after that -- in terms of my

5    withdrawing the motion to intervene -- confirms that.

6         THE COURT:  So what was the context of this standing

7    down?  Where in this process of litigation, where are the

8    parties and what was the substance of those discussions?

9         MR. DILLWORTH:  It was immediately after I reached out.

10   After I received the appointment, the receivership order, I

11   reached out to counsel to NLG and the parties representing NLG

12   trying to understand, what is this case?  What are the assets?

13   What do I need to do?

14        Is there a ship with rotting fish that needs to be

15   saved and monetized, or is this something different?

16        And that was immediate.  So I think it was within 10

17   days that I realized that there was a substantial

18   disagreement -- or a substantial argument about underlying

19   service of the complaint, which led to the default judgment,

20   which led to the receivership order that NLG was contending

21   that.  Going back in time, I would have done it the exact same

22   way.

23        Maybe I would have reached a more formal agreement, but

24   I could see no better path forward, given the fact that the

25   judgment was $40,000, the other creditor claims were roughly a

24

1    couple hundred thousand dollars, and this judgment against

2    Ms. Hazan was, roughly, five million dollars.

3         The best thing for me to do, knowing that if I would

4    have intervened and started taking over litigation, I still

5    would have used the same lawyers, was to agree to stand down

6    until they sorted out this issue about the service of the

7    underlying complaint that the Genovese firm filed against NLG.

8         And so there was no specific discussions about the

9    litigation after that.  I really did, in my mind, stand down

10   because I -- in my mind, NLG was going to continue on with

11   whatever needed to be done.

12        And I wanted to finish a point I was trying to make a

13   moment ago.  The only thing that surprised me about the filing

14   of the notice of appeal was not that it had been filed.

15        The only thing that surprised me was that they took it

16   at that stage in the litigation, because as I read that final

17   judgment -- and I know it says "final judgment" before you,

18   it's an interlocutory order -- it did not resolve all of the

19   underlying claims between the parties that were at issue in the

20   adversary proceeding.

21        And again, I haven't studied it for these particular

22   facts, but I've been a bankruptcy lawyer for, roughly, since

23   1992.

24        And when you have eight claims and only seven are

25   adjudicated and the same adversary, you can call the judgment,

1   the partial judgment of all those eight claims anything you

2   want, it's still interlocutory, until the remainder of the

3   litigation was filed.

4         So I know my first question was, why did you guys take

5   the appeal anyway?  It's interlocutory.  But you still got to

6   get the rest of the litigation resolved, and then you take it

7   up, and the only exception to that is if you ask for -- to

8   pursue an interlocutory appeal.  There's a motion and procedure

9   under Rule 8000; and that, to me, was the only surprise, that

10  they took it in the first place.

11        Anyways, Your Honor, I certainly don't want you to

12  think negatively of me.  When I reached this decision to stand

13  down -- it's an unartful term -- I didn't think that I'd be

14  here today trying to explain it, right.

15        But when I reached that --

16        THE COURT:  You do understand the reason you have to

17  explain it is because Judge Gordo's order appointing you

18  receiver vested all authority to act on behalf of NLG --

19        MR. DILLWORTH:  Yes.

20        THE COURT:  -- and you, and you alone.

21        MR. DILLWORTH:  Yes.  And I acknowledge that.

22        However, it was entered without hearing and a unique

23  set of facts that I immediately became familiar with about the

24  underlying service.  Now, I don't know how Judge Gordo is going

25  to resolve that, but -- you know, look, the state court system

26

1    is really overly burdened with litigation.

2         THE COURT:  Counsel, I was a county and circuit judge

3    for 10-and-a-half years.  I know the state system.

4         MR. DILLWORTH:  And so, but -- as an arm of the

5    Court -- and I hesitate to interrupt, Your Honor.  As an arm of

6    the Court, I really thought exercising my discretion -- which

7    is what a receiver's supposed to do -- I did the right thing

8    here.

9         And I know what those words and that order said, but it

10   just felt like the right thing to do, particularly since a

11   motion was filed by NLG to sort out this issue about the

12   validity of the underlying Genovese judgment.

13        THE COURT:  All right.

14        I guess we'll start with you, Mr. Ramirez.

15        MR. RAMIREZ:  Judge, the only thing I would like to add

16   was there was a hearing in front of Judge Cristol, which Eric

17   Silver, who was representing the receiver, raised this issue of

18   whether I had authority to represent NLG, and Mr. Silver told

19   Judge Cristol -- that they agreed that I could continue

20   representing NLG, and Judge Cristol accepted that.

21        So given all the e-mails exchanged with Mr. Dillworth

22   and the fact that he acquiesced to my continued representation;

23   and Mr. Silver's also, on the record, acquiesces in front of

24   Judge Cristol, I thought that I was perfectly capable to

25   represent NLG on the appeal and that I have full authority to

1    represent NLG.

2         So if I had thought that there was any way -- any

3    possibility that that could be called into question, I would

4    have had written a very formal, notarized agreement from

5    Mr. Dillworth retaining me as counsel for NLG, because that's

6    all I'm doing. I'm not trying to represent NLG, other than as

7    counsel.  I'm not a party.

8         I think the standing issue of NLG is, whether its

9    receiver or Mr. Kosachuk, it's still the same NLG.  And I

10   didn't think that there was any problem with my authority to

11   represent, and I apologize if I caused any confusion or any

12   delay in these proceedings.

13        THE COURT:  So this -- you included on page two of the

14   motion for relief an excerpt from the transcript.

15        Well, actually, the transcript is --

16        MR. RAMIREZ:  We attached the entire transcript as an

17   exhibit.

18        THE COURT:  The authority, based on Mr. Silver's

19   statements, weren't as clear to me as they are to you, and

20   perhaps you can kind of walk me through the transcript where

21   he's indicating there's authorization.

22        MR. RAMIREZ:  You know, I don't even know what the

23   hearing was about because I wasn't even in the country, but I

24   had somebody cover for me.

25        And I think Mr. Langley raised the issue of whether my

1    standing could in any way speak for NLG, and that's when

2    Mr. Silver spoke up.  And from the response from Judge Cristol,

3    he seemed to acquiesce to that arrangement.

4         THE COURT:  So, I mean, obviously, one other way to

5    have this --

6         MR. RAMIREZ:  And, by the way, I have a motion tomorrow

7    on the motion calendar.  I still have a special appointment

8    later on.  I thought that my motion was so clearcut, because

9    the summons was issued against the wrong corporation.

10        They sued first NLG, a Pennsylvania corporation, and

11   then they filed an amended complaint changing that to NLG, a

12   Delaware corporation, but the summons was never amended and

13   they ended up serving NLG, a Pennsylvania corporation.

14        So I think that motion calendar should be more than

15   sufficient.  There are all sorts of other problems with the

16   appointment of the receiver, but if they can -- you know, if

17   they set aside and they came to a default judgment, then we

18   could go back to square one.

19        And we don't deny that Genovese is entitled to recover

20   their fees.  We just -- everything that happened in the state

21   court proceeding was without notice to my client.

22        THE COURT:  So the hearing on that underlying action

23   brought by Genovese Joblove, that is before Judge Ruiz

24   tomorrow?

25        MR. RAMIREZ:  The motion calendar, and if he accepts my

 1   argument as to the summons, which I don't see how they -- you

 2   know, they never filed a response to my motion, so I don't know

 3   if they have anything to argue in rebuttal.

 4        But it's pretty clearcut that the summons that the

 5   Clerk issued was against NLG, LLC, a Pennsylvania corporation,

 6   and they served the registered agent in -- with an address

 7   of --

 8        THE COURT:  Well, you don't have to argue it to me here

 9   today but, I mean, if you had simply told me that it's set for

10   tomorrow --

11        MR. RAMIREZ:  I do.

12        THE COURT:  -- I would have simply moved today's

13   hearing to wait to find out what Judge Ruiz does.

14        So, counsel, if Judge Ruiz vacates Judge Gordo's order

15   or vacates the judgment, does that render all this moot then?

16        MR. LANGLEY:  I would say, no, Judge.  There's an

17   order, it's in effect today.

18        I would point out a couple of things.

19        This is the first I've heard from Mr. Ramirez about it

20   being a different state, as opposed to a different registered

21   agent.  The motion to set aside the final judgment claimed that

22   Genovese served the wrong registered agent.

23        But also in the file -- which Judge Ramirez is familiar

24   with, and so is Mr. Dillworth -- is Genovese Joblove's motion

25   for sanctions, attorneys fees and costs, pursuant to 57.105

1    against NLG, Christopher Kosachuk -- the gentleman sitting

2    here -- and its counsel, claiming that Mr. Kosachuk went in

3    after the receivership order, changed the registered agent and

4    then filed a motion saying "you served the wrong registered

5    agent."

6          And there's a response filed by Genovese, and there's a

7    motion for sanctions.  This is all set for April 9th.

8          We just learned today that Judge Ramirez is trying to

9    get something set on motion calendar tomorrow.  There had been

10   a prior hearing.  I guess that was continued because of the

11   change of judges.  But there's a special set hearing where all

12   this can be aired out April 9th.

13         But I would point out a couple of other things, Judge.

14         THE COURT:  Wait, wait a minute.  The special set

15   hearing in the Genovese Joblove versus NLG case?

16         MR. LANGLEY:  Yes.  All these things you've heard

17   about:  The motion to set aside the final judgment, this motion

18   by Genovese for sanctions back against them because they

19   changed the registered agent -- not only after the lawsuit was

20   filed and served, but after the receiver was appointed, in

21   violation, again, of the receivership order changing the

22   registration of NLG, so that Mr. Kosachuk could come back and

23   say, "Oh, you served the wrong registered agent."

24         They're claiming that he committed an outright fraud.

25   I don't think there's much chance that Judge Ruiz is going to

31

1    set aside this final judgment based on that.

2         I would also point out, Judge, that there's yet another

3    state court case.  NLG claimed that it had the second mortgage

4    on Ms. Hazan's property.  Chase claims they purchased the first

5    mortgage on Ms. Hazan's property.  They have a foreclosure suit

6    pending.  We advised Chase of the receivership order.  They

7    filed it in that case, in the Circuit Court of Miami-Dade.

8         In that case, on February 8th, Mr. Dillworth filed

9    consent of receiver for defendant NLG and its current counsel

10   to defend the case.

11        So what they did not do in this case -- and I think

12   Mr. Dillworth answered the only question that mattered.  He

13   didn't even know about the notice of appeal when it was filed,

14   so he certainly didn't authorize it, as the order clearly

15   requires.

16        But they just a month ago filed a consent for

17   Judge Ramirez to represent NLG in the state court.  They

18   realized they needed some written consent for him to do it in

19   the state court.  They didn't do it in this case.

20        I'd also point out that in late December, December

21   27th, at 1:00, my client and Mr. Meehan and Mr. Grant met with

22   Mr. Dillworth, as receiver, and his attorney, for a settlement

23   conference.  We can't get into, of course, into the settlement

24   discussions.

25        But there was a meeting with Drew Dillworth, as

1   receiver, on December 27th.  There has been ongoing discussions

2   with him as receiver.  In the state court, he's clearly the

3   receiver, and he gave them specific consent, something he

4   didn't do here.

5        And he points out that the only real asset of NLG is

6   this final judgment, which means this appeal is the only

7   significant thing that matters to NLG, and they neglected to

8   comply with Judge Gordo's receivership order and get written

9   consent before filing this notice of appeal.

10       It was clearly filed without the receiver's consent.  I

11  think --

12       THE COURT:  So does there have to be some magic words?

13       What Mr. Dillworth seemed to say today was that he

14  didn't specifically authorize it, but he didn't prohibit it.

15  He knew about it -- about the litigation in bankruptcy court --

16  and he didn't prohibit it, he didn't step in, so -- is that

17  sufficient?

18       MR. LANGLEY:  No, Judge.  I mean, clearly, he didn't

19  completely stand down.  He didn't advocate.  He didn't go back

20  to Judge Gordo and say "remove me as receiver."  That's clear

21  by the fact that he signed a consent order in the Chase case

22  saying, I'm the receiver and I need to give you permission,

23  Judge Ramirez, to go represent NLG.

24       The fact that he's meeting with my client, with

25  Selective, in December, as the receiver.

33

 1          But more significantly, Judge, nobody knew who, if

 2    anyone, was going to appeal until Judge Cristol entered his

 3    final judgment November 1 and the notice of appeal was filed

 4    November 8th.  And Mr. Dillworth said, he knew nothing about it

 5    until after it was filed so how could he possibly have

 6    consented if he didn't know?

 7          THE COURT:  So, on that issue, is Judge Cristol's order

 8    a final, appealable order anyway, as Mr. Dillworth questioned,

 9    or not?

10          MR. LANGLEY:  Two things, Judge.  One is, it's too late

11    for them to raise that issue, that's not -- it hasn't been

12    raised at any point, at any time, in this whole discussion

13    until Mr. Dillworth walked up to the microphone.

14          Second, it is final.  If you look at it, there is this

15    issue of the lien that goes back 10 years, to a note and

16    mortgage signed 10 years ago, that's been in litigation all of

17    this time.

18          Completely separate from that there were some tort

19    claims, personally, against Mr. Kosachuk acting on behalf of

20    NLG, for certain things that he's done in the past few years,

21    completely separate from the lien issue.

22          The judge bifurcated the case because they were

23    completely separate issues, and we went to trial just on

24    Counts 1, 2 and 3.

25          And the Judge entered, clearly, a final judgment,

34

1   resolved every issue, it cleared title to the property, it

2   eliminated the note and mortgage, it found that -- by the way,

3   it found that Selective is a creditor of NLG.

4          And Selective certainly was not conferenced in, was not

5   consulted, as far as letting Judge Ramirez file the appeal on

6   behalf of NLG.

7          Selective is a creditor as of this moment of NLG.

8          THE COURT:  So there's a subsequent-filed judgment

9   after the final judgment at issue here?

10          MR. LANGLEY:  No.  The November 1 final judgment ended

11   all litigation concerning that issue and those parties and the

12   lien issue.  And we have researched that as well, Judge.  It's

13   clearly a final judgment capable of being taken up on appeal.

14          THE COURT:  So, I'm just curious, it isn't involving

15   any issues here today, but what was Selective's litigation

16   against NLG in New York?

17          MR. LANGLEY:  If you have two more hours, we could

18   start --

19          THE COURT:  Give me the short version.

20          MR. LANGLEY:  Selective has a judgment against --

21   obtained a judgment against NLG, which was domesticated here.

22   They executed on NLG -- that's the Judge Lopez case.  They

23   executed on NLG and then got an assignment of the note,

24   mortgage, final judgment.

25          THE COURT:  No, I understand all that.

1          What was the underlying litigation?  What were the

2    claims in that case?

3          MR. RAMIREZ:  I've been involved in this a lot longer

4    than Mr. Langley, if I can tell you, Judge, if I may.

5          MR. LANGLEY:  Well, I have a basic understanding,

6    Judge, but it's complicated and it really doesn't concern --

7    and it's a valid final judgment.  For 10 years they have been

8    saying it's not.

9          But every court, including after the bankruptcy was

10   filed -- in violation of the automatic stay -- they went to

11   New York, removed the state court case to the federal court.

12         And the federal judge said all of your arguments -- she

13   disagreed with all our arguments that the final judgment

14   against NLG was -- she said it was final, it wasn't procured by

15   fraud.

16         She dismissed all of their claims and issued an order

17   to show cause to their New York counsel for why he shouldn't be

18   sanctioned for bringing a frivolous claim in the federal court.

19         THE COURT:  Okay.  So, as you know, from my earlier

20   order, there's usually a background section when I write those

21   orders, and I'm curious because it wasn't clear what that

22   litigation was about.

23         MR. RAMIREZ:  I could tell you very quickly what the

24   New York judgment was.  It was a judgment by confession, of

25   which is allowed under New York law, and it was obtained by a

1    predecessor of Selective, which was called Quebec, which it's

2    assumed under.

3           And they filed in Pennsylvania and they obtained a

4    charging order -- which was a violation of Pennsylvania law, by

5    the way.  And they went to New York, and then the same party,

6    Mr. Houle -- whatever his name is -- he represented both the

7    plaintiff and the defendant, and he reached a consent judgment

8    of five million dollars based upon abuse of process.

9           We've been trying to get that judgment vacated with

10   New York and -- if you look at the record of the New York

11   court, it got continued numerous times until finally they were

12   going to have a hearing that day, and the day before they said,

13   well, wait a minute, that judgment has been satisfied.

14          So the judge in New York said, well, it's satisfied, I

15   don't have to do anything.  He dismissed it.

16          Then I came back to this Court, and I went to Judge

17   Lopez, who had domesticated that judgment.

18          I said, "Judge, look, they've satisfied that judgment,

19   you can dismiss this case."

20          He did.

21          All of this was brought in front of Judge Gordo.  She

22   saw through this whole litany of litigation and all these

23   different jurisdictions, and she gave us a final judgment of

24   foreclosure.

25          So, basically, our position is that that judgment in

 1    New York was fraudulently obtained.  Selective cannot get more

 2    than Quebec had when they assigned the judgment.  That judgment

 3    is still fraudulent.  Judge Lopez said, no, you have to go to

 4    New York.  I'm not going to get into due process, and we've

 5    never had full litigation of that judgment.

 6          But that judgment is now satisfied, so it's moot.

 7          THE COURT:  But that's the problem, right, that -- that

 8    NLG didn't -- it sounds like -- appeal that decision in

 9    New York?

10          MR. RAMIREZ:  They didn't appeal it, 'cause they had

11    never heard of that judgment until after a year had gone by;

12    and then they, for the first time, used it here, incidentally,

13    while our appeal was pending in the Third District on the

14    foreclosure.  So they managed to create many smoke screens in

15    this case.

16          When I got into this, I thought it was a very simple

17    foreclosure, and here I am, over four years later, trying to

18    get this thing closed.

19          THE COURT:  You seem to take issue in my order

20    referring to this -- all this litigation as a "saga."

21          I stand by those words.  All right.

22          So I think what you --

23          MR. GRANT:  Yeah, Your Honor, I just wanted to make one

24    brief point about the Selective Advisors' judgment.

25          All of these issues were litigated in front of

1    Judge Cristol.  In fact, at the conclusion of the trial in

2    front of Judge Cristol, he asked all of us -- after we gave him

3    everything.  We gave Judge Cristol every ruling, every order,

4    every judgment, New York, all the different jurisdictions.

5          Judge Cristol on the record said, "Gentlemen, do you

6    stipulate that all of these judges are final?"

7          And everyone said yes.

8          And so, Judge Cristol took all that information and

9    spent a few months compressing the detailed history of these

10   parties, and that's when the Court issued -- that Judge Cristol

11   issued his final judgment.

12         So to now continue to re-argue these issues, we're well

13   passed that.  And what I'd also like to say, Your Honor, there

14   was never a stay of the receivership order at any point in

15   time.

16         Mr. Silver, Mr. Drew Dillworth's colleague, approached

17   us and left immediately, saying -- once they were appointed --

18   and they were appointed after a hearing, Your Honor.

19         There was a hearing.  Genovese Joblove filed a motion

20   to appoint a receiver, and Genovese Joblove and Battista

21   drafted the order appointing Mr. Dillworth as receiver.  So it

22   didn't come out of nowhere.  They specifically selected him to

23   act as receiver.

24         At any point in time when he became -- when

25   Mr. Dillworth became aware of the appeal -- and he admits that

39

1    he didn't learn of it -- they filed it even before he learned

2    of it.  File a consent, file a motion to stay the receivership

3    in state court, do something where the parties know who has the

4    authority to act on behalf of who.  Instead, nothing's done.

5              And instead, the appeal continues as it is.  And as

6    Your Honor pointed out in your order, there was a violation of

7    the receivership order, and no one never attempted to cure that

8    by filing a motion to stay, which is all it would have taken, a

9    stipulation amongst NLG and the receiver:

10             "Hey, NLG, you handle the appeal.  File something in

11   that case indicating that, instead of leaving it out there."

12             But they didn't.

13             And the other point, Your Honor, what happens if the

14   receiver or Genovese keeps their judgment?  Because at that

15   point, if the receiver didn't file anything -- I guess this is

16   probably a problem for down the road:

17             But if the receiver turns out to have the appeal and

18   didn't file anything, are we back here again in front of

19   Your Honor dealing with this authority issue?

20             THE COURT:  So what happens if Judge Ruiz vacates

21   the --

22             MR. GRANT:  Denies the --

23             THE COURT:  -- grants NLG's motion and vacates

24   Judge Gordo's order nunc pro tunc to which he issued it, then

25   where does that leave us?

1        MR. GRANT:  Well, if it's nunc pro tunc, Your Honor,

2   certainly, then that's if there was never a receiver.

3        THE COURT:  You understanding?

4        MR. GRANT:  But that's -- certainly, if that happens,

5   then that changes anything.

6        THE COURT:  All right.  And I'm assuming you're not a

7   party to that litigation?

8        MR. GRANT:  I'm not a party to that litigation, Your

9   Honor.

10       MR. LANGLEY:  And, Judge, I would just ask that this

11  Court not give the receiver and NLG any reason to want to go

12  back in front of Judge Ruiz and say, you know, let's set this

13  all aside.

14       THE COURT:  Well, if I keep the order, which is what

15  you want me to do, then, of course, they're going to go to

16  Judge Ruiz.  I mean --

17       MR. LANGLEY:  Well --

18       THE COURT:  Of course, that's part of the reason why

19  they're going to Judge Ruiz, presumably; right?

20       MR. LANGLEY:  Well, but, Judge, what you said in your

21  order is you can't, after the fact, comply with -- you know --

22  fix the failing to comply with a Court order.

23       There is, as of this moment, a receivership order in

24  place, and they did not comply with that in filing this notice

25  of appeal.  I believe that's all you need to know.

1          I would not want to give NLG some reason to go try to

2    settle up with the receiver and get this all set aside nunc pro

3    tunc as an after-the-fact way to reinstate an appeal.

4          THE COURT:  So, one thing I'm still not clear on, is

5    the hearing tomorrow to take up these issues or is it the

6    special set in April?

7          MR. RAMIREZ:  He gave to us a motion calendar, because

8    I want to argue -- just if you look at the summons, that's

9    enough.

10         THE COURT:  Well -- I'm going to re-set this to find

11   out how Judge Ruiz rules.  So I just need to know how much

12   time, is it next week, or do I need to set it in April?

13         MR. RAMIREZ:  Well, I think if he takes it up on the

14   motion calendar tomorrow, you can do it any time after

15   tomorrow.

16         But if he wants to take evidence, which I don't see

17   why, because some of this is very clear on its face.  It's a

18   documentary motion, it should be fairly easy, because, as a

19   matter of law, you can't change jurisdiction over a corporation

20   that you've had to never served.

21         And they never served NLG Delaware.

22         They served NLG Pennsylvania.

23         THE COURT:  All right.  So --

24         MR. RAMIREZ:  But I would like to add one more thing --

25         THE COURT:  Sure.

1            MR. RAMIREZ:  -- because they made a big point of all

2     this.  There is nothing in the receivership order that

3     prevented Mr. Dillworth from telling me, go ahead and continue

4     representing NLG, I was not acting without any authority.

5            I thought, you know, if I needed that, I would have

6     gotten a written consent or a written authority to represent

7     them.  Verbally, I then backed up with these e-mails, he told

8     me I had the authority to represent NLG.  That is not in

9     violation of the receivership or the Court order.

10           THE COURT:  Well, he didn't say that.

11           MR. RAMIREZ:  I'm sorry?

12           THE COURT:  Mr. Dillworth did not say that he told you

13    that you had the authority to represent NLG.  If you want me to

14    ask that question right now, that's fine, but that's not what

15    he said.

16           MR. LANGLEY:  What he said, Judge, was that he didn't

17    even know about the notice of appeal until after it was filed,

18    so how could he have given consent?

19           And, Judge, it's -- April 9th is an evidentiary

20    hearing, which I think is required in the state court case, and

21    I'm not sure that Genovese, or whoever else is still involved,

22    has consented to re-setting it.

23           THE COURT:  So, Mr. Dillworth, you've heard the

24    argument from both sides?

25           MR. DILLWORTH:  I have, Judge.  And again, I come back

43

1    to when we had the exchange in September that is now before the

2    Court.  My expectation was -- in standing down -- that counsel

3    would continue to do whatever he needed to do, and so that was

4    my understanding of what we agreed to.

5          And all the parties to the receivership agreed to that.

6    You now have a third party saying, well, we should have done

7    something more.  They don't really have standing to argue in a

8    receivership about what the parties to it decided to do.

9          THE COURT:  But I'm still not clear what you're telling

10   me that you agreed to do.

11         You said that you agreed to stand down.

12         MR. DILLWORTH:  Yes.  And again --

13         THE COURT:  And again --

14         MR. DILLWORTH:  -- I'm having a hard time articulating.

15         THE COURT:  I asked you before, what is it that you

16   thought -- what did you think that meant?

17         MR. DILLWORTH:  Everything -- that counsel would

18   continue doing everything they needed to do to protect and

19   preserve the assets of NLG, of which there's only one, which is

20   this underlying judgment.

21         So again, getting back to, we filed this motion to

22   intervene.  We have this dust up -- "we" being NLG's counsel

23   and myself -- about the service of the underlying complaint

24   that gave rise to the Genovese judgment.

25         Exercising my discretion -- and again, I've done it

**44**

1    over and over again -- given the facts of this case, not a

2    different one -- I said, okay, I'm going to wait until Judge

3    Gordo, who issued the very judgment we're arguing about, who

4    didn't mention that judgment in her receivership order to

5    clarify whether or not this is a real receivership.

6            THE COURT:  So when you agreed to stand down, were you

7    aware that Mr. Ramirez was going to represent NLG in the

8    bankruptcy proceedings?

9            MR. DILLWORTH:  Yes.  And that's why we withdrew our

10   motion to intervene.  In fact, if you look at the bankruptcy

11   record, you will see two things, my firm, Eric Silver, who is

12   going to represent me in this small receivership case, filed a

13   motion, and that motion suggested that my firm was going to

14   represent me.

15           And you will then see an amended motion almost the day

16   after it, it wasn't immediate, because I realized that our

17   office had filed a draft that I had changed my mind on; that

18   given the saga that Your Honor just talked about a moment ago,

19   and which I understood, this is a far bigger case; right?

20           But I would have been hiring Ramirez to do whatever it

21   would have been, and I would have been the party to have

22   intervened, so Ramirez would now have talked to me.

23           But given the size of the judgment, NLG's equity would

24   still have an interest in the receivership case.  So when I

25   withdrew that motion, consistent with my agreement to stand

1   down -- and I regret that now, that it wasn't more formal -- it

2   was with the idea that NLG would continue representing its

3   interest in preserving this judgment.

4         THE COURT:  Was there a discussion about how this

5   should happen?  You know, typically, when -- I mean, receivers

6   can hire lawyers to conduct litigation on behalf of the

7   receivership estate, right.  But the lawsuits are typically --

8   where the receiver is the plaintiff -- it is the receiver

9   acting on behalf of X company.

10        So -- but it wasn't the case here.  I mean, even the

11  appeal, it's not -- it's NLG, but it's not in your name.

12        MR. DILLWORTH:  Yes, because we withdrew the motion to

13  intervene because of this issue about the underlying Genovese

14  judgment.

15        And again, it may be inartful, but it seemed like the

16  most practical way of dealing with the very serious issue that

17  NLG raised about the underlying judgment.

18        And I want to speak to my colleagues, whom I know,

19  about this meeting that occurred recently; as if to suggest

20  that by taking that meeting I was telling Mr. Langley -- who

21  was at the meeting -- that I was fully engaged and was going

22  to -- we came to an agreement, we'd prosecute that plea.

23        And I would challenge him to come tell you now that I

24  did anything different than tell him, look, until this issue

25  about the underlying Genovese judgment is resolved, I'm not

1    doing anything.  Now, I can take a meeting because I am aware

2    that parties should settle cases that are complicated.  I'm

3    aware that there are other creditors and, frankly, in a case

4    like this, that's all there would be to do, is to try to settle

5    a case.  So I took the meeting, certainly.

6         But I was very clear with them, and to suggest

7    otherwise really is disturbing to me now.  It is clear to them

8    that I wasn't about to do anything until this issue was

9    resolved about the underlying Genovese judgment.

10        And so I didn't act in any way inconsistent with what,

11   again, what I thought the agreement was that I reached with NLG

12   and the creditor that got me appointed.

13        The only parties that I really have fiduciary duties to

14   back in September, which was, okay, there's a serious issue

15   here about the judgment, there's a serious issue that has been

16   raised by a prominent member of the bar about service.

17        The law is very clear, if it wasn't served, that

18   judgment was void -- not voidable -- void.  And I had an

19   experience in the case I referenced earlier, Your Honor, Nica,

20   N-I-C-A, Holdings, and that case -- a little bit different

21   facts -- went to Eleventh Circuit, I represented the Chapter 7

22   trustee who inherited a case filed by an assignee.

23        And there was a challenge right at the beginning of

24   that case about that assignee's authority to file the

25   bankruptcy, which went to the heart of the subject matter

1    jurisdiction of the case.  The bankruptcy court found -- in

2    that case, the bankruptcy court found, nope, he had the

3    authority to file.

4         And the appeal of that original order that started that

5    Chapter 7 bankruptcy case was dismissed on appeal in the

6    district court.  So what did my client do?  He began

7    administering the case, a case that nobody wants, he

8    administered the assets and, ultimately, when it got to the

9    Eleventh Circuit, the Eleventh Circuit found that there was no

10   authority and it undid everything -- had a cascading effect --

11   it undid every single thing that my client had done in the

12   bankruptcy case for two years.  Not of his fault.

13        But my point is, it was very serious repercussions for

14   me personally because I worked on it two years, so I'm very

15   sensitive to the one thing that should be more important to

16   your court, to any court appointing a receiver.

17        If there's subject matter jurisdictions in dispute,

18   that needs to be determined first; just like on appeal, it can

19   be determined or looked at by any court.

20        And when it was raised to me, it was a serious issue.

21        The party who raised it gave, you know, validity to it.

22   Here's a lawyer who is a former Third Circuit District Court of

23   Appeal judge.  The law is pretty clear, there was no service,

24   the judgment's void.

25        My order, the receivership order, which was not

**48**

1    conducting the hearing.  The first sentence says an ex parte

2    order of receivership.  There's no record for me to look at,

3    I'm very concerned --

4           THE COURT:  Right.  I --

5           MR. DILLWORTH:  -- and they don't have anything going

6    on.

7           THE COURT:  Counsel, I understand your concern, and I'm

8    out of time.  But what you also have to own is there was a

9    better way to handle this; and as a receiver appointed, who

10   didn't ask to be appointed, in particular, the thing for you

11   would have been to go to Judge Gordo immediately when you

12   realized that there were these issues and say you may want to

13   revisit this, because they are these problems.

14          Because you, with competing parties, are the one

15   independent person that can offer the Court that insight in the

16   case, but that didn't happen here.

17          MR. DILLWORTH:  I own that, Judge.  I did rely on the

18   fact that there was a motion immediately filed.

19          THE COURT:  Counsel, counsel, we're not going back and

20   forth.  I'm done.  I'm going to re-set this in 30 days.

21          Tomorrow, Mr. Ramirez, you can inform Judge Ruiz that

22   I'm waiting for a ruling one way or another.

23          And can you give me a status date?  Okay.  We'll set

24   this for status again, and the parties can appear by telephone,

25   on --

1           MR. GRANT:  Your Honor, about the date, do you want to

2      do a date after the April 9th state court hearing, or did you

3      want to do a status conference before?  Because I know it's 30

4      days, so we're right at the --

5           THE COURT:  We'll set it for -- there's really no time

6      issue in this case; right?

7           MR. RAMIREZ:  Judge, if we get a ruling tomorrow, we

8      would like to have the appeal reinstated and have them file

9      the --

10          THE COURT:  Well, I'll tell you what.  We'll set it for

11     status on Wednesday, April 11th, at 10:00; and if there is a

12     ruling before then, just file the order -- file a notice of

13     filing with the order and, of course, serve the other side and

14     then we'll take up what that means at another date.

15          MR. RAMIREZ:  Thank you, Judge.

16          MR. LANGLEY:  Judge, my concern would be what might

17     happen if now NLG and the receiver enter into a consent

18     agreement to set aside the final judgment, just so --

19          THE COURT:  We'll figure out what happens later.  But I

20     will say, finally, kind of knowing all of what happened here,

21     and now understanding that Citibank is involved, it would seem

22     that some global settlement might be in order here amongst the

23     parties, you know.

24          I mean, you know, so NLG didn't, obviously, do all it

25     should have done in Florida, or New York, or in the bankruptcy

1   court, yet for --

2          MR. RAMIREZ:  Judge, Mr. Kosachuk has made numerous --

3          THE COURT:  I'm not asking for a back and forth here.

4          MR. RAMIREZ:  All right.

5          THE COURT:  And what happened with -- I'm sorry for

6   forgetting your name -- Ms. Hazan, I believe, and Selective

7   Advisors, to say it seems a bit fishy, what happened in

8   New York, you know, and the litigation down here, you know, the

9   courts, you know, we -- as Judge Cristol did, try to make sense

10  of these orders, but it does seem, I think, in sense of equity,

11  not right.

12         I haven't issued an order, but obviously, I'll make a

13  decision finally once I know what's happened in the state

14  court.  Maybe I'll stick with my order, maybe I won't.  I don't

15  know yet.

16         But I think for each side to have some finality with

17  all this litigation, I think, perhaps you should talk it out

18  and see if you can reach some reasonable agreement, so that's

19  all I'm saying.

20         We are in recess.  Thank you.

21         MR. RAMIREZ:  Thank you, Judge.

22         COURTROOM DEPUTY:  All rise.

23         (Proceedings concluded at 11:24 a.m.)

24

25

1

2                         C E R T I F I C A T E

3

        I hereby certify that the foregoing is an
4
   accurate transcription of the proceedings in the
5
   above-entitled matter.
6

7
   March 12th, 2018     /s/Glenda M. Powers
8  DATE                   GLENDA M. POWERS, RPR, CRR, FPR
                          United States District Court
9                         400 North Miami Avenue, 08S33
                          Miami, Florida 33128
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$40,000** [1] - 12:25

## /

**/s/Glenda** [1] - 40:7

## 0

**08S33** [2] - 2:11, 40:9

## 1

**1** [4] - 1:8, 22:3, 22:24, 23:10
**10** [4] - 12:16, 22:15, 22:16, 24:7
**10-and-a-half** [1] - 15:3
**10:00** [2] - 1:7, 38:11
**10:30** [1] - 1:7
**11:24** [2] - 1:7, 39:23
**11th** [1] - 38:11
**12th** [1] - 40:7
**15** [1] - 10:3
**17-Civil-24127** [1] - 3:5
**197** [1] - 1:23
**1992** [1] - 13:23
**1:00** [1] - 20:21
**1:17-CV-24127-DPG** [1] - 1:2

## 2

**2** [1] - 22:24
**20** [1] - 10:3
**200** [1] - 1:23
**33128** [2] - 2:11, 40:9
**33322** [1] - 1:20
**33432** [1] - 1:24

## 3

**3** [1] - 22:24
**30** [2] - 37:20, 38:3
**303** [1] - 1:20
**33128** [2] - 2:11, 40:9
**33322** [1] - 1:20
**33432** [1] - 1:24

## 4

**40,000** [1] - 6:11
**400** [2] - 2:11, 40:9
**47** [1] - 1:8

## 5

**57.105** [1] - 18:25

## 6

**6** [1] - 1:5

## 7

**7** [2] - 35:21, 36:5

## 8

**8000** [1] - 14:9
**8551** [1] - 1:19
**8th** [2] - 20:8, 22:4

## 9

**9th** [4] - 19:7, 19:12, 31:19, 38:2

## A

**a.m** [4] - 1:7, 1:7, 39:23
**a/k/a** [2] - 2:3
**A/K/A** [2] - 1:7, 1:18
**above-entitled** [1] - 40:5
**abuse** [1] - 25:8
**accepted** [1] - 15:20
**accepts** [1] - 17:25
**accomplished** [1] - 10:5
**accurate** [1] - 40:4
**acknowledge** [1] - 14:21
**acquiesce** [1] - 17:3
**acquiesced** [1] - 15:22
**acquiesces** [1] - 15:23
**act** [4] - 14:18, 27:23, 28:4, 35:10
**acting** [3] - 22:19, 31:4, 34:9
**action** [2] - 10:23, 17:22
**activity** [2] - 5:11, 10:4
**add** [2] - 15:15, 30:24
**addition** [1] - 8:19
**address** [1] - 18:6
**adjudicated** [3] - 9:25, 10:16, 13:25
**administer** [1] - 6:25
**administered** [1] - 36:8
**administering** [1] - 36:7
**admits** [1] - 27:25
**adversary** [2] - 13:20, 13:25
**advised** [1] - 20:6

**ADVISORS** [2] - 1:7, 1:22
**Advisors** [3] - 3:4, 3:12, 39:7
**Advisors'** [1] - 26:24
**advocate** [1] - 21:19
**after-the-fact** [1] - 30:3
**agent** [7] - 18:6, 18:21, 18:22, 19:3, 19:5, 19:19, 19:23
**ago** [4] - 13:13, 20:16, 22:16, 33:18
**agree** [1] - 13:5
**agreed** [8] - 7:15, 10:22, 15:19, 32:4, 32:5, 32:10, 32:11, 33:6
**agreeing** [1] - 9:1
**agreement** [10] - 10:17, 10:21, 12:2, 12:23, 16:4, 33:25, 34:22, 35:11, 38:18, 39:18
**ahead** [1] - 31:3
**aired** [1] - 19:12
**al** [1] - 3:5
**allowed** [1] - 24:25
**almost** [1] - 33:15
**alone** [1] - 14:20
**ALSO** [1] - 2:1
**ambiguity** [1] - 6:9
**amended** [3] - 17:11, 17:12, 33:15
**AND** [2] - 1:7, 1:12
**answered** [1] - 20:12
**anyway** [5] - 8:12, 8:24, 10:18, 14:5, 22:8
**anyways** [1] - 14:11
**apologize** [3] - 6:5, 9:7, 16:11
**appeal** [29] - 3:24, 11:20, 12:1, 13:14, 14:5, 14:8, 15:25, 20:13, 21:6, 21:9, 22:2, 22:3, 23:5, 23:13, 26:8, 26:10, 26:13, 27:25, 28:5, 28:10, 28:17, 29:25, 30:3, 31:17, 34:11, 36:4, 36:5, 36:18, 38:8
**Appeal** [1] - 36:23
**APPEAL** [1] - 1:12
**appealable** [1] - 22:8
**appear** [1] - 37:24
**APPEARANCES** [1] - 1:15
**appearances** [1] - 3:6

**applecart** [1] - 5:6
**appoint** [1] - 27:20
**appointed** [13] - 4:13, 4:23, 7:12, 7:16, 7:25, 8:6, 9:1, 19:20, 27:17, 27:18, 35:12, 37:9, 37:10
**appointing** [4] - 4:1, 14:17, 27:21, 36:16
**appointment** [4] - 7:14, 12:10, 17:7, 17:16
**approached** [1] - 27:16
**appropriate** [2] - 7:7, 10:23
**April** [7] - 19:7, 19:12, 30:6, 30:12, 31:19, 38:2, 38:11
**argue** [5] - 18:3, 18:8, 27:12, 30:8, 32:7
**arguing** [1] - 33:3
**argument** [3] - 12:18, 18:1, 31:24
**arguments** [2] - 24:12, 24:13
**arm** [2] - 15:4, 15:5
**arrangement** [1] - 17:3
**articulating** [1] - 32:14
**aside** [7] - 17:17, 18:21, 19:17, 20:1, 29:13, 30:2, 38:18
**asset** [5] - 5:15, 5:16, 7:4, 10:10, 21:5
**assets** [3] - 12:12, 32:19, 36:8
**assigned** [1] - 26:2
**assignee** [2] - 9:9, 35:22
**assignee's** [1] - 35:24
**assignment** [1] - 23:23
**assumed** [1] - 25:2
**assuming** [1] - 29:6
**attached** [1] - 16:16
**attacking** [2] - 6:18, 9:13
**attempted** [1] - 28:7
**attorney** [1] - 20:22
**attorneys** [1] - 18:25
**authority** [15] - 6:25, 14:18, 15:18, 15:25, 16:10, 16:18, 28:4, 28:19, 31:4, 31:6, 31:8, 31:13, 35:24, 36:3, 36:10
**authorization** [1] - 16:21
**authorize** [4] - 11:16,

11:21, 20:14, 21:14
**automatic** [1] - 24:10
**Avenue** [2] - 2:11, 40:9
**aware** [5] - 11:19, 27:25, 33:7, 35:1, 35:3

## B

**backed** [1] - 31:7
**background** [1] - 24:20
**backup** [1] - 4:10
**bankruptcy** [21] - 4:17, 5:20, 6:24, 7:6, 8:14, 8:15, 10:15, 10:20, 11:19, 13:22, 21:15, 24:9, 33:8, 33:10, 35:25, 36:1, 36:2, 36:5, 36:12, 38:25
**bar** [1] - 35:16
**based** [3] - 16:18, 20:1, 25:8
**basic** [1] - 24:5
**Battista** [1] - 27:20
**became** [4] - 14:19, 14:23, 27:24, 27:25
**BEFORE** [1] - 1:13
**beg** [1] - 8:8
**began** [1] - 36:6
**beginning** [1] - 35:23
**behalf** [8] - 3:15, 4:2, 14:18, 22:19, 23:6, 28:4, 34:6, 34:9
**best** [1] - 13:3
**better** [2] - 12:24, 37:9
**between** [2] - 9:18, 13:19
**bifurcated** [1] - 22:22
**big** [1] - 31:1
**bigger** [1] - 33:19
**bit** [2] - 35:20, 39:7
**Boca** [1] - 1:24
**Boulevard** [1] - 1:19
**brief** [1] - 26:24
**bringing** [1] - 24:18
**brought** [2] - 17:23, 25:21
**burdened** [1] - 15:1
**business** [1] - 5:8
**BY** [1] - 2:9

## C

**calendar** [6] - 17:7, 17:14, 17:25, 19:9, 30:7, 30:14
**cannot** [1] - 26:1

**capable** [2] - 15:24, 23:13
**capital** [1] - 5:7
**cascading** [1] - 36:10
**CASE** [1] - 1:2
**Case** [1] - 3:5
**case** [52] - 4:17, 5:8, 5:10, 5:15, 5:24, 6:22, 6:23, 6:24, 7:5, 7:19, 8:11, 8:12, 10:6, 10:9, 10:15, 12:12, 19:15, 20:3, 20:7, 20:8, 20:10, 20:11, 20:19, 21:21, 22:22, 23:22, 24:2, 24:11, 25:19, 26:15, 28:11, 31:20, 33:1, 33:12, 33:19, 33:24, 34:10, 35:3, 35:5, 35:19, 35:20, 35:22, 35:24, 36:1, 36:2, 36:5, 36:7, 36:12, 37:16, 38:6
**cases** [2] - 10:3, 35:2
**caused** [1] - 16:11
**certain** [2] - 11:8, 22:20
**certainly** [6] - 14:11, 20:14, 23:4, 29:2, 29:4, 35:5
**certify** [1] - 40:3
**challenge** [3] - 7:1, 34:23, 35:23
**challenging** [1] - 5:20
**chance** [1] - 19:25
**change** [2] - 19:11, 30:19
**changed** [3] - 19:3, 19:19, 33:17
**changes** [2] - 7:4, 29:5
**changing** [2] - 17:11, 19:21
**Chapter** [2] - 35:21, 36:5
**charging** [1] - 25:4
**Chase** [3] - 20:4, 20:6, 21:21
**chase** [1] - 11:14
**Chris** [2] - 2:2, 3:17
**Christopher** [1] - 19:1
**Circuit** [6] - 6:23, 20:7, 35:21, 36:9, 36:22
**circuit** [2] - 7:5, 15:2
**circumstances** [1] - 9:11
**Citibank** [1] - 38:21
**claim** [2] - 6:14, 24:18
**claimed** [2] - 18:21, 20:3

**claiming** [2] - 19:2, 19:24
**claims** [8] - 12:25, 13:19, 13:24, 14:1, 20:4, 22:19, 24:2, 24:16
**clarify** [1] - 33:5
**clear** [10] - 16:19, 21:20, 24:21, 30:4, 30:17, 32:9, 35:6, 35:7, 35:17, 36:23
**clearcut** [2] - 17:8, 18:4
**cleared** [1] - 23:1
**clearly** [6] - 20:14, 21:2, 21:10, 21:18, 22:25, 23:13
**Clerk** [1] - 18:5
**client** [7] - 3:12, 6:23, 17:21, 20:21, 21:24, 36:6, 36:11
**closed** [1] - 26:18
**colleague** [1] - 27:16
**colleagues** [1] - 34:18
**comfortable** [1] - 9:21
**coming** [1] - 7:24
**committed** [1] - 19:24
**company** [1] - 34:9
**competing** [1] - 37:14
**complaint** [9] - 6:1, 6:3, 6:18, 7:13, 11:2, 12:19, 13:7, 17:11, 32:23
**completely** [4] - 21:19, 22:18, 22:21, 22:23
**complicated** [3] - 4:5, 24:6, 35:2
**comply** [4] - 21:8, 29:21, 29:22, 29:24
**compressing** [1] - 27:9
**concern** [3] - 24:6, 37:7, 38:16
**concerned** [1] - 37:3
**concerning** [2] - 4:8, 23:11
**concluded** [5] - 5:14, 5:15, 5:22, 11:19, 39:23
**conclusion** [1] - 27:1
**condition** [1] - 8:21
**conduct** [2] - 11:16, 34:6
**conducting** [1] - 37:1
**conference** [2] - 20:23, 38:3
**conferenced** [1] - 23:4
**confession** [1] - 24:24
**confirms** [1] - 12:5

**confronted** [1] - 5:23
**confusion** [1] - 16:11
**connection** [1] - 5:5
**consciousness** [1] - 6:8
**consent** [12] - 20:9, 20:16, 20:18, 21:3, 21:9, 21:10, 21:21, 25:7, 28:2, 31:6, 31:18, 38:17
**consented** [2] - 22:6, 31:22
**consistent** [1] - 33:25
**consulted** [1] - 23:5
**contacted** [1] - 4:22
**contending** [1] - 12:20
**context** [2] - 4:25, 12:6
**continue** [8] - 12:3, 13:10, 15:19, 27:12, 31:3, 32:3, 32:18, 34:2
**continued** [3] - 15:22, 19:10, 25:11
**continues** [1] - 28:5
**corporation** [5] - 17:9, 17:10, 17:12, 17:13, 18:5, 30:19
**correct** [1] - 4:2
**costs** [1] - 18:25
**counsel** [23] - 3:6, 4:7, 4:17, 5:24, 6:13, 8:17, 10:18, 11:16, 12:11, 15:2, 16:5, 16:7, 18:14, 19:2, 20:9, 24:11, 32:10, 32:17, 32:22, 37:7, 37:19
**country** [1] - 16:23
**Counts** [1] - 22:24
**county** [1] - 15:2
**couple** [3] - 13:1, 18:18, 19:13
**course** [5] - 8:1, 20:23, 29:15, 29:18, 38:13
**Court** [22] - 2:10, 2:10, 3:1, 4:21, 5:3, 5:4, 5:17, 5:21, 8:6, 10:25, 15:5, 15:6, 20:7, 25:16, 27:10, 29:11, 29:22, 31:9, 32:2, 36:22, 37:15, 40:8
**court** [39] - 3:25, 4:11, 5:12, 5:19, 5:21, 7:6, 7:8, 7:16, 8:14, 8:16, 9:12, 9:15, 9:25, 10:19, 10:20, 11:19, 14:25, 17:21, 20:3,

20:17, 20:19, 21:2, 21:15, 24:9, 24:11, 24:18, 25:11, 28:3, 31:20, 36:1, 36:2, 36:6, 36:16, 36:19, 38:2, 39:1, 39:14
**COURT** [67] - 1:1, 3:3, 3:10, 3:14, 3:18, 3:22, 4:13, 4:22, 6:3, 7:11, 7:21, 7:23, 8:5, 9:3, 9:5, 9:8, 9:22, 11:4, 11:7, 11:14, 12:6, 14:16, 14:20, 15:2, 15:13, 16:13, 16:18, 17:4, 17:22, 18:8, 18:12, 19:14, 21:12, 22:7, 23:8, 23:14, 23:19, 23:25, 24:19, 26:7, 26:19, 28:20, 28:23, 29:3, 29:6, 29:14, 29:18, 30:4, 30:10, 30:23, 30:25, 31:10, 31:12, 31:23, 32:9, 32:13, 32:15, 33:6, 34:4, 37:4, 37:7, 37:19, 38:5, 38:10, 38:19, 39:3, 39:5
**Court's** [1] - 8:23
**court's** [1] - 6:20
**court-appointed** [1] - 7:16
**COURTROOM** [3] - 3:2, 3:4, 39:22
**courtroom** [1] - 3:9
**courts** [1] - 39:9
**cover** [1] - 16:24
**create** [1] - 26:14
**creditor** [8] - 4:15, 4:16, 8:25, 9:5, 12:25, 23:3, 23:7, 35:12
**creditors** [2] - 6:11, 35:3
**Cristol** [13] - 15:16, 15:19, 15:20, 15:24, 17:2, 22:2, 27:1, 27:2, 27:3, 27:5, 27:8, 27:10, 39:9
**Cristol's** [1] - 22:7
**CRR** [2] - 2:9, 40:8
**cure** [1] - 28:7
**curious** [5] - 10:13, 23:14, 24:21
**current** [1] - 20:9
**cut** [1] - 11:14

**D**

**Dade** [2] - 6:13, 20:7

**DARRIN** [1] - 1:13
**date** [4] - 37:23, 38:1, 38:2, 38:14
**DATE** [1] - 40:8
**DAVID** [1] - 1:18
**David** [2] - 1:19, 3:7
**days** [3] - 12:17, 37:20, 38:4
**dealing** [2] - 28:19, 34:16
**Debtor** [1] - 2:3
**Debtor's** [1] - 2:4
**December** [4] - 20:20, 21:1, 21:25
**decided** [1] - 32:8
**decision** [3] - 14:12, 26:8, 39:13
**default** [3] - 6:2, 12:19, 17:17
**defend** [1] - 20:10
**defendant** [2] - 20:9, 25:7
**Defendant/Appellant** [1] - 1:4
**Delaware** [2] - 17:12, 30:21
**delay** [1] - 16:12
**denies** [1] - 28:22
**deny** [1] - 17:19
**DEPUTY** [3] - 3:2, 3:4, 39:22
**detailed** [1] - 27:9
**determine** [2] - 5:8, 5:12
**determined** [3] - 5:18, 36:18, 36:19
**different** [11] - 7:19, 8:11, 12:15, 18:20, 25:23, 27:4, 33:2, 34:24, 35:20
**DILLWORTH** [28] - 3:20, 4:4, 4:14, 4:24, 6:5, 7:18, 7:22, 8:4, 8:8, 9:4, 9:7, 9:9, 9:24, 11:5, 11:8, 11:18, 12:9, 14:19, 14:21, 15:4, 31:25, 32:12, 32:14, 32:17, 33:9, 34:12, 37:5, 37:17
**Dillworth** [18] - 3:21, 4:1, 15:21, 16:5, 18:24, 20:8, 20:12, 20:22, 20:25, 21:13, 22:4, 22:8, 22:13, 27:21, 27:25, 31:3, 31:12, 31:23
**Dillworth's** [1] - 27:16
**directed** [1] - 6:25
**disagreed** [1] - 24:13

disagreement [1] - 12:18
discretion [2] - 15:6, 32:25
discussion [2] - 22:12, 34:4
discussions [4] - 12:8, 13:8, 20:24, 21:1
dismiss [1] - 25:19
dismissed [3] - 24:16, 25:15, 36:5
DISMISSING [1] - 1:12
dismissing [1] - 3:24
dispute [2] - 11:1, 36:17
District [4] - 2:10, 26:13, 36:22, 40:8
DISTRICT [3] - 1:1, 1:1, 1:14
district [1] - 36:6
disturbing [1] - 35:7
division [1] - 11:7
DIVISION [1] - 1:2
documentary [1] - 30:18
dollars [3] - 13:1, 13:2, 25:8
domesticated [2] - 23:21, 25:17
done [11] - 7:20, 8:13, 12:21, 13:11, 22:20, 28:4, 32:6, 32:25, 36:11, 37:20, 38:25
down [19] - 8:22, 9:1, 9:10, 9:21, 9:23, 10:21, 11:15, 12:3, 12:7, 13:5, 13:9, 14:13, 21:19, 28:16, 32:2, 32:11, 33:6, 34:1, 39:8
draft [1] - 33:17
drafted [1] - 27:21
Drew [3] - 3:21, 20:25, 27:16
due [1] - 26:4
dust [1] - 32:22
duties [1] - 35:13

## E

e-mails [3] - 4:6, 15:21, 31:7
ears [1] - 5:4
easy [1] - 30:18
effect [2] - 18:17, 36:10
effectively [1] - 7:9
eight [2] - 13:24, 14:1
Eleventh [4] - 6:23,

35:21, 36:9
eliminated [1] - 23:2
Elizabeth [2] - 2:3, 3:8
ELIZABETH [2] - 1:7, 1:19
emergency [1] - 10:8
ended [2] - 17:13, 23:10
engaged [1] - 34:21
enter [1] - 38:17
entered [7] - 4:11, 4:18, 6:21, 9:14, 14:22, 22:2, 22:25
entire [1] - 16:16
entitled [2] - 17:19, 40:5
equity [2] - 33:23, 39:10
Equity [1] - 5:24
Eric [2] - 15:16, 33:11
ESQ [3] - 1:17, 1:18, 1:22
estate [1] - 34:7
et [1] - 3:5
evidence [1] - 30:16
evidentiary [4] - 5:13, 8:20, 9:16, 31:19
ex [2] - 4:14, 37:1
exact [1] - 12:21
exactly [2] - 7:19, 9:22
exception [1] - 14:7
excerpt [1] - 16:14
exchange [1] - 32:1
exchanged [1] - 15:21
executed [2] - 23:22, 23:23
exercising [2] - 15:6, 32:25
exhibit [1] - 16:17
expectation [1] - 32:2
experience [1] - 35:19
experienced [1] - 8:3
explain [2] - 14:14, 14:17
eyes [1] - 5:4

## F

face [1] - 30:17
fact [9] - 12:24, 15:22, 21:21, 21:24, 27:1, 29:21, 30:3, 33:10, 37:18
facts [5] - 7:19, 13:22, 14:23, 33:1, 35:21
failing [1] - 29:22
fairly [1] - 30:18
familiar [3] - 8:17, 14:23, 18:23
far [2] - 23:5, 33:19

fault [1] - 36:12
February [1] - 20:8
Federal [1] - 1:23
federal [3] - 24:11, 24:12, 24:18
fees [2] - 17:20, 18:25
felt [1] - 15:10
few [2] - 22:20, 27:9
fiduciary [1] - 35:13
figure [1] - 38:19
file [12] - 18:23, 23:5, 28:2, 28:10, 28:15, 28:18, 35:24, 36:3, 38:8, 38:12
filed [34] - 4:15, 6:3, 6:25, 7:13, 9:12, 9:19, 11:22, 13:7, 13:14, 14:3, 15:11, 17:11, 18:2, 19:4, 19:6, 19:20, 20:7, 20:8, 20:13, 20:16, 21:10, 22:3, 22:5, 23:8, 24:10, 25:3, 27:19, 28:1, 31:17, 32:21, 33:12, 33:17, 35:22, 37:18
filing [7] - 8:20, 9:1, 13:13, 21:9, 28:8, 29:24, 38:13
final [23] - 4:20, 5:16, 13:16, 13:17, 18:21, 19:17, 20:1, 21:6, 22:3, 22:8, 22:14, 22:25, 23:9, 23:10, 23:13, 23:24, 24:7, 24:13, 24:14, 25:23, 27:6, 27:11, 38:18
finality [1] - 39:16
finally [3] - 25:11, 38:20, 39:13
fine [1] - 31:14
finish [1] - 13:12
firm [4] - 6:11, 13:7, 33:11, 33:13
first [10] - 8:1, 11:19, 14:4, 14:10, 17:10, 18:19, 20:4, 26:12, 36:18, 37:1
fish [1] - 12:14
fishy [1] - 39:7
five [2] - 13:2, 25:8
fix [1] - 29:22
FLORIDA [1] - 1:1
Florida [6] - 1:4, 1:20, 1:24, 2:11, 38:25, 40:9
FOR [5] - 1:12, 1:12, 1:17, 1:18, 1:22
foreclosure [5] - 4:20, 20:5, 25:24, 26:14,

26:17
foregoing [1] - 40:3
forgetting [1] - 39:6
formal [3] - 12:23, 16:4, 34:1
former [5] - 5:24, 6:14, 36:22
forth [3] - 9:18, 37:20, 39:3
forward [1] - 12:24
four [1] - 26:17
FPR [2] - 2:9, 40:8
frankly [2] - 10:22, 35:3
fraud [2] - 19:24, 24:15
fraudulent [1] - 26:3
fraudulently [1] - 26:1
frivolous [1] - 24:18
FROM [1] - 1:12
front [7] - 15:16, 15:23, 15:21, 26:25, 27:2, 28:18, 29:12
full [2] - 15:25, 26:5
fully [1] - 34:21
furious [1] - 7:24

## G

Gayles [1] - 3:20
GAYLES [1] - 1:13
Genovese [24] - 6:3, 6:11, 7:13, 9:6, 9:9, 9:18, 10:22, 13:7, 15:12, 17:19, 17:23, 18:22, 18:24, 19:6, 19:15, 19:18, 27:19, 27:20, 28:14, 31:21, 32:24, 34:13, 34:25, 35:9
gentleman [1] - 19:1
Gentlemen [1] - 27:5
given [7] - 10:23, 12:24, 15:21, 31:18, 33:1, 33:18, 33:23
GLENDA [1] - 2:9, 40:8
global [1] - 38:22
Gordo [11] - 7:8, 7:11, 10:7, 10:11, 11:8, 11:12, 14:24, 21:20, 25:21, 33:3, 37:11
Gordo's [4] - 14:17, 18:14, 21:8, 28:24
GRANT [8] - 1:22, 3:11, 26:23, 28:22, 29:1, 29:4, 29:8, 38:1
Grant [3] - 1:22, 3:11, 20:21

grants [1] - 28:23
GROUP [2] - 1:7, 1:22
Group [2] - 3:5, 3:12
guess [3] - 15:14, 19:10, 28:15
guys [1] - 14:4

## H

half [1] - 6:15
handle [2] - 28:10, 37:9
hard [2] - 6:7, 32:14
Hashanah [1] - 4:8
Hazan [6] - 2:3, 3:8, 13:2, 39:6
HAZAN [4] - 1:7, 1:18, 1:19
Hazan's [2] - 20:4, 20:5
hear [1] - 10:25
heard [7] - 9:15, 11:4, 11:5, 18:19, 19:16, 26:11, 31:23
HEARING [1] - 1:11
hearing [23] - 4:12, 4:18, 5:1, 8:20, 8:22, 9:16, 10:8, 11:13, 14:22, 15:16, 16:23, 17:22, 18:13, 19:10, 19:11, 19:15, 25:12, 27:18, 27:19, 30:5, 31:20, 37:1, 38:2
heart [3] - 6:19, 11:25, 35:25
hereby [1] - 40:3
hesitate [1] - 15:5
Highway [1] - 1:23
hire [1] - 34:6
hired [1] - 10:18
hiring [1] - 33:20
history [1] - 27:9
holder [1] - 10:22
Holdings [1] - 6:23, 35:20
holiday [1] - 4:8
Honor [21] - 3:7, 3:11, 4:6, 6:5, 6:6, 7:18, 8:8, 11:10, 14:11, 15:5, 26:23, 27:13, 27:18, 28:6, 28:13, 28:19, 29:1, 29:9, 33:18, 35:19, 38:1
Honor's [2] - 3:21, 11:25
HONORABLE [1] - 1:13
houle [1] - 25:6
hours [1] - 23:17
hundred [2] - 6:13,

13:1
**Husband** [1] - 2:4

## I

**idea** [2] - 4:14, 34:2
**identify** [1] - 10:10
**immediate** [2] - 12:16, 33:16
**immediately** [11] - 5:11, 5:23, 8:21, 9:12, 10:5, 10:7, 12:9, 14:23, 27:17, 37:11, 37:18
**important** [1] - 36:15
**inartful** [1] - 34:15
**incidentally** [2] - 4:16, 26:12
**included** [1] - 16:13
**including** [1] - 24:9
**inconsistent** [1] - 35:10
**independent** [1] - 37:15
**indicating** [2] - 16:21, 28:11
**indulgence** [1] - 8:9
**inform** [1] - 37:21
**information** [1] - 27:8
**inherited** [2] - 6:24, 35:22
**insight** [1] - 37:15
**instead** [3] - 28:4, 28:5, 28:11
**interest** [2] - 33:24, 34:3
**interfere** [1] - 7:9
**interlocutory** [4] - 13:18, 14:2, 14:5, 14:8
**interrupt** [1] - 15:5
**intervene** [5] - 8:14, 12:5, 32:22, 33:10, 34:13
**intervened** [3] - 8:16, 13:4, 33:22
**investigated** [1] - 5:6
**involved** [4] - 9:17, 24:3, 31:21, 38:21
**involving** [1] - 23:14
**issue** [28] - 8:22, 9:25, 10:10, 10:14, 13:6, 13:19, 15:11, 15:17, 16:8, 16:25, 22:7, 22:11, 22:15, 22:21, 23:1, 23:9, 23:11, 23:12, 26:19, 28:19, 34:13, 34:16, 34:24, 35:8, 35:14, 35:15, 36:20, 38:6

**issued** [13] - 4:12, 4:19, 5:2, 10:11, 17:9, 18:5, 24:16, 27:10, 27:11, 28:24, 33:3, 39:12
**issues** [8] - 7:12, 7:14, 22:23, 23:15, 26:25, 27:12, 30:5, 37:12

## J

**Joblove** [7] - 6:4, 7:13, 9:6, 17:23, 19:15, 27:19, 27:20
**Joblove's** [1] - 18:24
**Joe** [1] - 3:11
**JOEY** [1] - 1:22
**joining** [1] - 3:16
**JUAN** [1] - 1:17
**Juan** [1] - 3:15
**judge** [13] - 4:18, 4:19, 5:2, 7:8, 11:7, 15:2, 15:15, 22:22, 24:12, 25:14, 26:3, 36:23, 38:16
**JUDGE** [1] - 1:14
**Judge** [73] - 3:20, 4:4, 7:8, 7:11, 7:12, 10:7, 10:11, 11:8, 11:9, 11:10, 11:12, 14:17, 14:24, 15:16, 15:19, 15:20, 15:24, 17:2, 17:23, 18:13, 18:14, 18:16, 18:23, 19:8, 19:13, 19:25, 20:2, 20:17, 21:8, 21:18, 21:20, 21:23, 22:1, 22:2, 22:7, 22:10, 22:25, 23:5, 23:12, 23:22, 24:4, 24:6, 25:16, 25:18, 25:21, 27:1, 27:2, 27:3, 27:5, 27:8, 27:10, 28:20, 28:24, 29:10, 29:12, 29:16, 29:19, 29:20, 30:11, 31:16, 31:19, 31:25, 33:2, 37:11, 37:17, 37:21, 38:7, 38:15, 39:2, 39:9, 39:21
**judges** [2] - 19:11, 27:6
**judgment** [77] - 4:12, 4:15, 4:16, 4:20, 5:3, 5:16, 5:19, 5:20, 6:2, 6:12, 6:17, 6:19, 6:21, 9:10, 9:13, 9:18, 9:20, 10:1, 10:11, 10:15, 10:22, 12:19, 12:25, 13:1,

13:17, 13:25, 14:1, 15:12, 17:17, 18:15, 18:21, 19:17, 20:1, 21:6, 22:3, 22:25, 23:8, 23:9, 23:10, 23:13, 23:20, 23:21, 23:24, 24:7, 24:13, 24:24, 25:7, 25:9, 25:13, 25:17, 25:18, 25:23, 25:25, 26:2, 26:5, 26:6, 26:11, 26:24, 27:4, 27:11, 28:14, 32:20, 32:24, 33:3, 33:4, 33:23, 34:3, 34:14, 34:17, 34:25, 35:9, 35:15, 35:18, 38:18
**judgment's** [1] - 36:24
**jurisdiction** [6] - 6:20, 7:6, 8:23, 9:13, 30:19, 36:17
**jurisdictions** [3] - 25:23, 27:4, 36:17

## K

**keep** [1] - 29:14
**keeps** [1] - 28:14
**kind** [8] - 4:25, 5:8, 5:10, 5:14, 10:8, 10:9, 16:20, 38:20
**knowing** [5] - 5:1, 6:6, 13:3, 38:20
**Kosachuk** [8] - 2:2, 3:17, 16:9, 19:1, 19:2, 19:22, 22:19, 39:2

## L

**LANGLEY** [15] - 1:18, 3:7, 18:16, 19:16, 21:18, 22:10, 23:10, 23:17, 23:20, 24:5, 29:10, 29:17, 29:20, 31:16, 38:16
**Langley** [5] - 1:19, 3:7, 16:25, 24:4, 34:20
**last** [1] - 7:7
**late** [2] - 20:20, 22:10
**law** [5] - 24:25, 25:4, 30:19, 35:17, 36:23
**lawsuit** [1] - 19:19
**lawsuits** [1] - 34:7
**lawyer** [3] - 6:14, 13:22, 36:22
**lawyers** [2] - 13:5, 34:6
**learn** [1] - 28:1

**learned** [2] - 19:8, 28:1
**least** [1] - 8:9
**leave** [1] - 28:25
**leaving** [1] - 28:11
**led** [5] - 5:13, 12:19, 12:20
**left** [1] - 27:17
**less** [1] - 6:16
**letting** [1] - 23:5
**lien** [3] - 22:15, 22:21, 23:12
**litany** [1] - 25:22
**litigate** [1] - 12:3
**litigated** [1] - 26:25
**litigation** [27] - 5:6, 5:18, 5:19, 7:4, 11:17, 11:18, 12:7, 13:4, 13:9, 13:16, 14:3, 14:6, 15:1, 21:15, 22:16, 23:11, 23:15, 24:1, 24:22, 25:22, 26:5, 26:20, 29:7, 29:8, 34:6, 39:8, 39:17
**lived** [1] - 6:22
**living** [1] - 8:10
**Liza** [1] - 2:3
**LIZA** [2] - 1:7, 1:18
**LLC** [9] - 1:4, 1:7, 1:17, 1:22, 2:2, 3:4, 3:5, 3:16, 18:5
**look** [10] - 6:17, 8:15, 14:25, 22:14, 25:10, 25:18, 30:8, 33:10, 34:24, 37:2
**looked** [1] - 36:19
**Lopez** [3] - 23:22, 25:17, 26:3

## M

**magic** [1] - 21:12
**mails** [3] - 4:6, 15:21, 31:7
**managed** [1] - 26:14
**managing** [1] - 3:16
**March** [1] - 1:5
**march** [1] - 40:7
**Marshall** [1] - 1:22
**matter** [8] - 6:20, 7:6, 7:9, 10:15, 30:19, 35:25, 36:17, 40:5
**mattered** [1] - 20:12
**matters** [1] - 21:7
**mean** [13] - 6:3, 7:15, 8:2, 9:22, 10:25, 17:4, 18:9, 21:18, 29:16, 34:5, 34:10, 38:24

**meaning** [1] - 5:24
**means** [2] - 21:6, 38:14
**meant** [3] - 9:24, 12:3, 32:16
**Meehan** [3] - 2:4, 3:12, 20:21
**meeting** [7] - 20:25, 21:24, 34:19, 34:20, 34:21, 35:1, 35:5
**member** [3] - 3:16, 35:16
**mention** [1] - 33:4
**mentioned** [1] - 10:12
**met** [1] - 20:21
**MIAMI** [1] - 1:2
**Miami** [7] - 1:4, 2:11, 2:11, 6:13, 20:7, 40:9, 40:9
**Miami-Dade** [2] - 6:13, 20:7
**MICHAEL** [1] - 1:22
**microphone** [2] - 4:3, 22:13
**middle** [1] - 11:11
**might** [4] - 6:6, 11:9, 38:16, 38:22
**million** [3] - 6:16, 13:2, 25:8
**mind** [8] - 8:24, 9:23, 9:24, 11:23, 12:2, 13:9, 13:10, 33:17
**minute** [3] - 9:3, 19:14, 25:13
**moment** [5] - 4:10, 13:13, 23:7, 29:23, 33:18
**monetized** [1] - 12:15
**month** [1] - 20:16
**months** [1] - 27:9
**moot** [2] - 18:15, 26:6
**morning** [5] - 3:7, 3:11, 3:15, 3:20, 3:22
**mortgage** [5] - 20:3, 20:5, 22:16, 23:2, 23:24
**most** [2] - 10:23, 34:16
**motion** [39] - 3:23, 4:15, 8:21, 9:2, 9:12, 9:19, 11:1, 12:5, 14:8, 15:11, 16:14, 17:6, 17:7, 17:8, 17:14, 17:25, 18:2, 18:21, 18:24, 19:4, 19:7, 19:9, 19:17, 27:19, 28:2, 28:8, 28:23, 30:7, 30:14, 30:18, 32:21, 33:10,

33:13, 33:15, 33:25, 34:12, 37:18
**MOTION** [2] - 1:11, 1:12
**moved** [1] - 18:12
**MR** [70] - 3:7, 3:11, 3:15, 3:19, 3:20, 4:4, 4:14, 4:24, 6:5, 7:18, 7:22, 8:4, 8:8, 9:4, 9:7, 9:9, 9:24, 11:5, 11:8, 11:10, 11:18, 12:9, 14:19, 14:21, 15:4, 15:15, 16:16, 16:22, 17:6, 17:25, 18:16, 19:16, 21:18, 22:10, 23:10, 23:17, 23:20, 24:3, 24:5, 24:23, 26:10, 26:23, 28:22, 29:1, 29:4, 29:8, 29:10, 29:17, 29:20, 30:7, 30:13, 30:24, 31:1, 31:11, 31:16, 31:25, 32:12, 32:14, 32:17, 33:9, 34:12, 37:5, 37:17, 38:1, 38:7, 38:15, 38:16, 39:2, 39:4, 39:21

## N

**name** [3] - 25:6, 34:11, 39:6
**names** [1] - 9:8
**need** [5] - 12:13, 21:22, 29:25, 30:11, 30:12
**needed** [7] - 8:25, 10:4, 13:11, 20:18, 31:5, 32:3, 32:18
**needs** [4] - 5:9, 5:11, 12:14, 36:18
**negatively** [1] - 14:12
**neglected** [1] - 21:7
**Neil** [1] - 2:4
**never** [12] - 7:1, 7:6, 7:15, 17:12, 18:2, 26:5, 26:11, 27:14, 28:7, 29:2, 30:20, 30:21
**New** [15] - 23:16, 24:11, 24:17, 24:24, 24:25, 25:5, 25:10, 25:14, 26:1, 26:4, 26:9, 27:4, 38:25, 39:8
**next** [1] - 30:12
**Nica** [2] - 6:23, 35:19
**NICA** [1] - 35:20
**NLG** [74] - 1:4, 1:17,

2:2, 3:16, 4:2, 4:17, 5:7, 5:16, 5:24, 6:11, 6:14, 6:15, 8:20, 9:1, 9:12, 9:18, 10:11, 12:3, 12:11, 12:20, 13:7, 13:10, 14:18, 15:11, 15:18, 15:20, 15:25, 16:1, 16:5, 16:6, 16:8, 16:9, 17:1, 17:10, 17:11, 17:13, 18:5, 19:1, 19:15, 19:22, 20:3, 20:9, 20:17, 21:5, 21:7, 21:23, 22:20, 23:3, 23:6, 23:7, 23:16, 23:21, 23:22, 23:23, 24:14, 26:8, 28:9, 28:10, 29:11, 30:1, 30:21, 30:22, 31:4, 31:8, 31:13, 32:19, 33:7, 34:2, 34:11, 34:17, 35:11, 38:17, 38:24
**nLG** [2] - 3:4
**NLG's** [8] - 1:12, 3:23, 4:7, 10:17, 11:16, 28:23, 32:22, 33:23
**NO** [1] - 1:2
**nobody** [2] - 22:1, 36:7
**North** [2] - 2:11, 40:9
**notarized** [1] - 16:4
**note** [3] - 22:15, 23:2, 23:23
**nothing** [6] - 7:10, 8:12, 8:24, 9:24, 22:4, 31:2
**nothing's** [1] - 28:4
**notice** [8] - 13:14, 17:21, 20:13, 21:9, 22:3, 29:24, 31:17, 38:12
**November** [3] - 22:3, 22:4, 23:10
**nowhere** [1] - 27:22
**Number** [1] - 3:5
**numerous** [2] - 25:11, 39:2
**nunc** [3] - 28:24, 29:1, 30:2

## O

**obtained** [6] - 4:15, 4:16, 23:21, 24:25, 25:3, 26:1
**obviously** [4] - 8:10, 17:4, 38:24, 39:12
**occurred** [2] - 4:7, 34:19

**OF** - 1:1
**offer** [1] - 37:15
**office** [1] - 33:17
**Official** [1] - 2:10
**once** [2] - 27:17, 39:13
**one** [13] - 11:3, 17:4, 17:18, 22:10, 26:23, 28:7, 30:4, 30:24, 32:19, 33:2, 36:15, 37:14, 37:22
**ongoing** [1] - 21:1
**oppose** [1] - 9:10
**opposed** [1] - 18:20
**ORDER** [1] - 1:12
**order** [53] - 3:1, 3:21, 3:24, 3:25, 4:19, 5:2, 6:1, 9:14, 9:20, 10:2, 10:12, 10:25, 12:10, 12:20, 13:18, 14:17, 15:9, 18:14, 18:17, 19:3, 19:21, 20:6, 20:14, 21:8, 21:21, 22:7, 22:8, 24:16, 24:20, 25:4, 26:19, 27:3, 27:14, 27:21, 28:6, 28:7, 28:24, 29:14, 29:21, 29:22, 29:23, 31:2, 31:9, 33:4, 36:4, 36:25, 37:2, 38:12, 38:13, 38:22, 39:12, 39:14
**orders** [2] - 24:21, 39:10
**original** [1] - 36:4
**otherwise** [3] - 5:12, 10:18, 35:7
**outright** [1] - 19:24
**overly** [1] - 15:1
**own** [2] - 37:8, 37:17
**owns** [1] - 10:11

## P

**P.L** [1] - 1:22
**page** [1] - 16:13
**Pages** [1] - 1:8
**part** [2] - 11:11, 29:18
**parte** [2] - 4:14, 37:1
**partial** [1] - 14:1
**particular** [2] - 13:21, 37:10
**particularly** [1] - 15:10
**parties** [13] - 12:8, 12:11, 13:19, 23:11, 27:10, 28:3, 32:5, 32:8, 35:2, 35:13, 37:14, 37:24, 38:23
**party** [8] - 5:23, 16:7, 25:5, 29:7, 29:8, 32:6, 33:21, 36:21

**passed** [1] - 27:13
**past** [1] - 22:20
**path** [1] - 12:24
**pending** [3] - 5:5, 20:6, 26:13
**Pennsylvania** [6] - 17:10, 17:13, 18:5, 25:3, 25:4, 30:22
**perfectly** [1] - 15:24
**perhaps** [2] - 16:20, 39:17
**permission** [1] - 21:22
**person** [1] - 37:15
**personally** [2] - 22:19, 36:14
**place** [2] - 14:10, 29:24
**placed** [1] - 5:20
**plaintiff** [2] - 25:7, 34:8
**plaintiffs/Appellees** [1] - 1:8
**Plantation** [1] - 1:20
**plea** [1] - 34:22
**point** [13] - 13:12, 18:18, 19:13, 20:2, 20:20, 22:12, 26:24, 27:14, 27:24, 28:13, 28:15, 31:1, 36:13
**pointed** [1] - 28:6
**points** [1] - 21:5
**position** [1] - 25:25
**possibility** [1] - 16:3
**possibly** [1] - 22:5
**post** [1] - 4:12
**post-judgment** [1] - 4:12
**Powers** [1] - 40:7
**POWERS** [2] - 2:9, 40:8
**practical** [1] - 34:16
**predecessor** [1] - 25:1
**prepare** [1] - 6:7
**PRESENT** [1] - 2:1
**preserve** [1] - 32:19
**preserving** [1] - 34:3
**presumably** [1] - 29:19
**pretty** [2] - 18:4, 36:23
**prevented** [1] - 31:3
**principal** [1] - 4:7
**pro** [3] - 28:24, 29:1, 30:2
**problem** [5] - 8:6, 11:11, 16:10, 26:7, 28:16
**problems** [3] - 7:25, 17:15, 37:13
**procedure** [1] - 14:8

**proceeding** [4] - 4:20, 5:13, 13:20, 17:21
**proceedings** [4] - 16:12, 33:8, 39:23, 40:4
**process** [4] - 8:14, 12:7, 25:8, 26:4
**procured** [1] - 24:14
**prohibit** [2] - 21:14, 21:16
**prominent** [1] - 35:16
**pronouns** [1] - 9:7
**property** [3] - 20:4, 20:5, 23:1
**prosecute** [1] - 34:22
**protect** [1] - 32:18
**purchased** [1] - 20:4
**pursuant** [2] - 3:21, 18:25
**pursue** [1] - 14:8
**put** [1] - 4:6

## Q

**Quebec** [2] - 25:1, 26:2
**questioned** [1] - 22:8
**questions** [1] - 6:6
**quickly** [3] - 5:14, 5:15, 24:23

## R

**raise** [1] - 22:11
**raised** [7] - 15:17, 16:25, 22:12, 34:17, 35:16, 36:20, 36:21
**Ramirez** [15] - 3:15, 4:17, 6:14, 8:17, 15:14, 18:19, 18:23, 19:8, 20:17, 21:23, 23:5, 33:7, 33:20, 33:22, 37:21
**RAMIREZ** [23] - 1:17, 3:15, 3:19, 11:10, 15:15, 16:16, 16:22, 17:6, 17:25, 18:11, 24:3, 24:23, 26:10, 30:7, 30:13, 30:24, 31:1, 31:11, 38:7, 38:15, 39:2, 39:4, 39:21
**Raton** [1] - 1:24
**re** [4] - 27:12, 30:10, 31:22, 37:20
**re-argue** [1] - 27:12
**re-set** [2] - 30:10, 37:20
**re-setting** [1] - 31:22
**reach** [1] - 39:18

**reached** [9] - 10:17,
10:21, 12:9, 12:11,
12:23, 14:12, 14:15,
25:7, 35:11
**read** [1] - 13:16
**real** [2] - 21:5, 33:5
**realized** [6] - 6:10,
12:17, 20:18, 33:16,
37:12
**really** [11] - 7:15, 8:25,
11:24, 13:9, 15:1,
15:6, 24:6, 32:7,
35:7, 35:13, 38:5
**reason** [4] - 14:16,
29:11, 29:18, 30:1
**reasonable** [1] - 39:18
**rebuttal** [1] - 18:3
**received** [1] - 12:10
**receiver** [34] - 4:1,
7:12, 7:16, 7:25, 8:2,
8:7, 14:18, 15:17,
16:9, 17:16, 19:20,
20:9, 20:22, 21:1,
21:2, 21:3, 21:20,
21:22, 21:25, 27:20,
27:21, 27:23, 28:9,
28:14, 28:15, 28:17,
29:2, 29:11, 30:2,
34:8, 36:16, 37:9,
38:17
**receiver's** [2] - 15:7,
21:10
**receivers** [1] - 34:5
**receivership** [31] -
4:9, 4:11, 4:19, 5:2,
5:13, 5:25, 9:14,
9:20, 10:1, 10:12,
12:10, 12:20, 19:3,
19:21, 20:6, 21:8,
27:14, 28:2, 28:7,
29:23, 31:2, 31:9,
32:5, 32:8, 33:4,
33:5, 33:12, 33:24,
34:7, 36:25, 37:2
**recently** [1] - 34:19
**recess** [1] - 39:20
**recognizing** [1] - 7:7
**record** [12] - 4:6, 5:13,
5:21, 6:12, 8:18,
10:19, 10:24, 15:23,
25:10, 27:5, 33:11,
37:2
**recover** [1] - 17:19
**referenced** [1] - 35:19
**referring** [1] - 26:20
**regarding** [2] - 7:13,
7:14
**registered** [7] - 18:6,
18:20, 18:22, 19:3,
19:4, 19:19, 19:23

**registration** [1] -
19:22
**regret** [1] - 34:1
**reinstate** [1] - 30:3
**reinstated** [1] - 38:8
**REINSTATEMENT** [1]
- 1:12
**reinstatement** [1] -
3:24
**RELIEF** [1] - 1:12
**relief** [2] - 3:23, 16:14
**rely** [1] - 37:17
**remainder** [1] - 14:2
**remove** [1] - 21:20
**removed** [1] - 24:11
**render** [1] - 18:15
**repercussions** [1] -
36:13
**replaced** [1] - 8:16
**REPORTED** [1] - 2:9
**Reporter** [1] - 2:10
**represent** [14] - 3:12,
15:18, 15:25, 16:1,
16:6, 16:11, 20:17,
21:23, 31:6, 31:8,
31:13, 33:7, 33:12,
33:14
**representation** [1] -
15:22
**representative** [3] -
2:2, 3:13, 9:18
**represented** [2] - 25:6,
35:21
**representing** [6] - 3:8,
12:11, 15:17, 15:20,
31:4, 34:2
**request** [1] - 10:22
**required** [1] - 31:20
**requires** [2] - 9:16,
20:15
**researched** [1] - 23:12
**resolve** [2] - 13:18,
14:25
**resolved** [6] - 7:1,
11:3, 14:6, 23:1,
34:25, 35:9
**respect** [1] - 7:18
**response** [3] - 17:2,
18:2, 19:6
**rest** [1] - 14:6
**rests** [2] - 6:21, 9:20
**retaining** [1] - 16:5
**revisit** [1] - 37:13
**revisited** [1] - 3:25
**rise** [6] - 3:2, 5:18, 6:2,
6:19, 32:24, 39:22
**road** [1] - 28:16
**role** [1] - 5:4
**Room** [1] - 2:11
**Rosh** [1] - 4:8

**rotting** [1] - 12:14
**roughly** [4] - 6:15,
12:25, 13:2, 13:22
**RPR** [2] - 2:9, 40:8
**Ruiz** [13] - 11:9, 11:10,
11:12, 17:23, 18:13,
18:14, 19:25, 28:20,
29:12, 29:16, 29:19,
30:11, 37:21
**Rule** [1] - 14:9
**rules** [1] - 30:11
**ruling** [4] - 27:3,
37:22, 38:7, 38:12

## S

**saga** [2] - 26:20, 33:18
**sanctioned** [1] - 24:18
**sanctions** [3] - 18:25,
19:7, 19:18
**satisfied** [4] - 25:13,
25:14, 25:18, 26:6
**saved** [2] - 5:9, 12:15
**saw** [2] - 9:19, 25:22
**Scheduled** [1] - 1:7
**screens** [1] - 26:14
**Sean** [1] - 2:4
**seated** [1] - 3:3
**second** [2] - 20:3,
22:14
**section** [1] - 24:20
**see** [7] - 6:17, 12:24,
18:1, 30:16, 33:11,
33:15, 39:18
**seem** [3] - 26:19,
38:21, 39:10
**selected** [1] - 27:22
**SELECTIVE** [2] - 1:7,
1:22
**Selective** [12] - 3:4,
3:12, 3:13, 21:25,
23:3, 23:4, 23:7,
23:20, 25:1, 26:1,
26:24, 39:6
**Selective's** [1] - 23:15
**sense** [2] - 39:9, 39:10
**sensitive** [1] - 36:15
**sentence** [1] - 37:1
**separate** [3] - 22:18,
22:21, 22:23
**September** [2] - 32:1,
35:14
**series** [1] - 4:6
**serious** [5] - 34:16,
35:14, 35:15, 36:13,
36:20
**serve** [1] - 38:13
**served** [9] - 18:6,
18:22, 19:4, 19:20,
19:23, 30:20, 30:21,

30:22, 35:17
**service** [12] - 5:25,
6:1, 6:18, 7:13, 11:2,
12:19, 13:6, 14:24,
32:23, 35:16, 36:23
**serving** [1] - 17:13
**set** [20] - 14:23, 17:17,
18:9, 18:21, 19:7,
19:9, 19:11, 19:14,
19:17, 20:1, 29:12,
30:2, 30:6, 30:10,
30:12, 37:20, 37:23,
38:5, 38:10, 38:18
**setting** [1] - 31:22
**settle** [3] - 30:2, 35:2,
35:4
**settlement** [3] - 20:22,
20:23, 38:22
**seven** [1] - 13:24
**several** [1] - 4:25
**ship** [1] - 12:14
**short** [1] - 23:19
**show** [1] - 24:17
**side** [2] - 38:13, 39:16
**sides** [1] - 31:24
**signed** [2] - 21:21,
22:16
**significant** [1] - 21:7
**significantly** [1] - 22:1
**Silver** [5] - 15:17,
15:18, 17:2, 27:16,
33:11
**Silver's** [2] - 15:23,
16:18
**similar** [1] - 7:3
**simple** [1] - 26:16
**simply** [2] - 18:9,
18:12
**single** [1] - 36:11
**sitting** [1] - 19:1
**situation** [1] - 7:3
**size** [2] - 6:17, 33:23
**small** [1] - 33:12
**smoke** [1] - 26:14
**Socarras** [1] - 1:22
**someone** [1] - 6:18
**sorry** [4] - 9:4, 11:1,
31:11, 39:5
**sort** [1] - 15:11
**sorted** [1] - 13:6
**sorts** [1] - 17:15
**sounds** [1] - 26:8
**South** [1] - 1:23
**SOUTHERN** [1] - 1:1
**special** [4] - 17:7,
19:11, 19:14, 30:6
**specific** [2] - 13:8,
21:3
**specifically** [4] -
11:16, 11:21, 21:14,

27:22
**spent** [1] - 27:9
**square** [1] - 17:18
**stage** [1] - 13:16
**stand** [13] - 8:22, 9:1,
10:21, 11:15, 12:3,
13:5, 13:9, 14:12,
21:19, 26:21, 32:11,
33:6, 33:25
**standing** [8] - 9:10,
9:21, 9:22, 12:6,
16:8, 17:1, 32:2,
32:7
**start** [2] - 15:14, 23:18
**started** [4] - 8:11,
8:13, 13:4, 36:4
**state** [22] - 3:25, 4:11,
5:19, 6:20, 7:8, 9:12,
9:15, 9:25, 10:19,
14:25, 15:3, 17:20,
18:20, 20:3, 20:17,
20:19, 21:2, 24:11,
28:3, 31:20, 38:2,
39:13
**statements** [1] - 16:19
**STATES** [2] - 1:1, 1:14
**States** [2] - 2:10, 40:8
**static** [1] - 7:9
**status** [4] - 37:23,
37:24, 38:3, 38:11
**stay** [4] - 24:10, 27:14,
28:2, 28:8
**STENOGRAPHICAL
LY** [1] - 2:9
**step** [2] - 12:4, 21:16
**stick** [1] - 39:14
**still** [13] - 4:1, 11:4,
11:5, 13:4, 14:2,
14:5, 16:9, 17:7,
26:3, 30:4, 31:21,
32:9, 33:24
**stipulate** [1] - 27:6
**stipulation** [1] - 28:9
**stream** [1] - 6:8
**structure** [1] - 5:7
**studied** [1] - 13:21
**subject** [5] - 6:20, 7:1,
7:5, 35:25, 36:17
**subsequent** [1] - 23:8
**subsequent-filed** [1] -
23:8
**substance** [2] - 11:25,
12:8
**substantial** [2] -
12:17, 12:18
**sued** [1] - 17:10
**sufficient** [2] - 17:15,
21:17
**suggest** [2] - 34:19,
35:6

**suggested** [1] - 33:13
**suit** [1] - 20:5
**Suite** [2] - 1:20, 1:23
**summons** [5] - 17:9, 17:12, 18:1, 18:4, 30:8
**Sunrise** [1] - 1:19
**supposed** [1] - 15:7
**surprise** [1] - 14:9
**surprised** [4] - 11:24, 12:1, 13:13, 13:15
**system** [2] - 14:25, 15:3

## T

**telephone** [1] - 37:24
**term** [1] - 14:13
**terms** [1] - 12:4
**THE** [67] - 1:13, 3:3, 3:10, 3:14, 3:18, 3:22, 4:13, 4:22, 6:3, 7:11, 7:21, 7:23, 8:5, 9:3, 9:5, 9:8, 9:22, 11:4, 11:7, 11:14, 12:6, 14:16, 14:20, 15:2, 15:13, 16:13, 16:18, 17:4, 17:22, 18:8, 18:12, 19:14, 21:12, 22:7, 23:8, 23:14, 23:19, 23:25, 24:19, 26:7, 26:19, 28:20, 28:23, 29:3, 29:6, 29:14, 29:18, 30:4, 30:10, 30:23, 30:25, 31:10, 31:12, 31:23, 32:9, 32:13, 32:15, 33:6, 34:4, 37:4, 37:7, 37:19, 38:5, 38:10, 38:19, 39:3, 39:5
**they've** [1] - 25:18
**thinking** [1] - 8:9
**Third** [2] - 26:13, 36:22
**third** [1] - 32:6
**thousand** [2] - 6:13, 13:1
**title** [1] - 23:1
**today** [7] - 6:7, 14:14, 18:9, 18:17, 19:8, 21:13, 23:15
**today's** [1] - 18:12
**tomorrow** [9] - 17:6, 17:24, 18:10, 19:9, 30:5, 30:14, 30:15, 37:21, 38:7
**took** [4] - 13:15, 14:10, 27:8, 35:5
**tort** [1] - 22:18

**totals** [1] - 6:15
**transcript** [4] - 16:14, 16:15, 16:16, 16:20
**transcription** [1] - 40:4
**transition** [1] - 11:12
**trial** [2] - 22:23, 27:1
**trouble** [1] - 11:13
**trustee** [1] - 35:22
**try** [3] - 30:1, 35:4, 39:9
**trying** [8] - 6:7, 12:12, 13:12, 14:14, 16:6, 19:8, 25:9, 26:17
**Tuesday** [1] - 1:6
**tunc** [3] - 28:24, 29:1, 30:3
**turns** [1] - 28:17
**two** [7] - 7:2, 16:13, 22:10, 23:17, 33:11, 36:12, 36:14
**type** [1] - 10:6
**typically** [2] - 34:5, 34:7

## U

**ultimately** [2] - 7:1, 36:8
**unartful** [1] - 14:13
**under** [4] - 9:10, 14:9, 24:25, 25:2
**underlying** [25] - 4:8, 4:19, 5:3, 5:16, 6:1, 6:18, 7:3, 9:13, 9:20, 10:11, 10:15, 11:2, 12:18, 13:7, 13:19, 14:24, 15:12, 17:22, 24:1, 32:20, 32:23, 34:13, 34:17, 34:25, 35:9
**understood** [1] - 33:19
**undid** [2] - 36:10, 36:11
**undo** [1] - 9:19
**undone** [1] - 7:5
**unique** [1] - 14:22
**united** [1] - 2:10
**United** [1] - 40:8
**UNITED** [2] - 1:1, 1:14
**unless** [1] - 3:25
**unlike** [1] - 10:3
**unsatisfied** [1] - 6:12
**up** [12] - 4:3, 14:7, 17:2, 17:13, 22:13, 23:13, 30:2, 30:5, 30:13, 31:7, 32:22, 38:14
**upset** [1] - 5:6

## V

**vacated** [1] - 25:9
**vacates** [4] - 18:14, 18:15, 28:20, 28:23
**valid** [1] - 24:7
**validity** [5] - 10:1, 10:14, 15:12, 36:21
**verbally** [1] - 31:7
**version** [1] - 23:19
**versus** [2] - 3:4, 19:15
**vested** [1] - 14:18
**view** [1] - 4:5
**violation** [5] - 19:21, 24:10, 25:4, 28:6, 31:9
**void** [3] - 35:18, 36:24
**voidable** [1] - 35:18
**vs** [1] - 1:5

## W

**wait** [7] - 9:3, 18:13, 19:14, 25:13, 33:2
**waiting** [1] - 37:22
**walk** [1] - 16:20
**walked** [1] - 22:13
**wants** [2] - 30:16, 36:7
**Wednesday** [1] - 38:11
**week** [1] - 30:12
**West** [1] - 1:19
**whole** [3] - 5:10, 22:12, 25:22
**WILLIAM** [1] - 1:18
**withdrawing** [1] - 12:5
**withdrew** [3] - 33:9, 33:25, 34:12
**wording** [1] - 11:15
**words** [3] - 15:9, 21:12, 26:21
**write** [1] - 24:20
**written** [5] - 16:4, 20:18, 21:8, 31:6

## Y

**year** [1] - 26:11
**years** [10] - 7:2, 10:4, 15:3, 22:15, 22:16, 22:20, 24:7, 26:17, 36:12, 36:14
**York** [15] - 23:16, 24:11, 24:17, 24:24, 24:25, 25:5, 25:10, 25:14, 26:1, 26:4, 26:9, 27:4, 38:25, 39:8

# EXHIBIT 2

*In Re Hazan – Voluntary Chapter 11 Bankruptcy*

Case No. 16-10389-AJC

May 8, 2018 Hearing Transcript

Page 1

1              UNITED STATES BANKRUPTCY COURT
                SOUTHERN DISTRICT OF FLORIDA
2                     MIAMI DIVISION

3

4

5

    IN RE:                    CASE NO. 16-10389-AJC
6
    LIZA HAZAN,
7
              Debtor.
8   _____/

9

10

11        ECF# 563, 590, 599, 605, 607, 610

12

13                  May 8, 2018

14

15          The above-entitled cause came on for hearing

16  before the Honorable A. JAY CRISTOL,  one of the Judges in

17  the  UNITED  STATES  BANKRUPTCY  COURT,  in  and  for  the

18  SOUTHERN  DISTRICT  OF FLORIDA, at 301 North Miami Avenue,

19  Miami, Miami-Dade County, Florida on Tuesday, May 8, 2018,

20  commencing  at  or  about  3:04 p.m.,  and  the  following

21  proceedings were had:

22

23

24     Transcribed from a Backup Digital Audio Recording by:
              Margaret Franzen, Court Reporter
25

Page 2

```
 1                         APPEARANCES:

 2

 3              DAVID W. LANGLEY, ESQUIRE
                  On behalf of the Debtor

 4

 5

                     FURR & COHEN, by
 6            ROBERT C. FURR, ESQUIRE (CourtCall)
      On behalf of the Board of Managers of Spencer Condominium

 7

 8

                 MARSHALL SOCARRAS GRANT, by
 9            JOE M. GRANT, ESQUIRE (CourtCall)
              On behalf of Selective Advisors Group

10

11

                  DAVID B. HABER, P.A., by
12            DAVID B. HABER, ESQUIRE (CourtCall)
        On behalf of Valencia Estates Homeowners' Association

13

14

                 JUAN RAMIREZ, ESQUIRE (CourtCall)
15                  On behalf of NLG, LLC

16

17        OFFICE OF THE UNITED STATES TRUSTEE, by
                JOHANNA ARMENGOL, ATTORNEY-AT-LAW
18                    Attorney/Advisor
              On behalf of the United States Trustee

19

20

                     ALSO PRESENT:
21

22

                  LIZA HAZAN, Debtor
23      ECRO - Electronic Court Reporting Operator

24

                     - - - - - - -
25
```

```
 1                    THE COURT:  Good afternoon.  Be seated,
 2     please.  Three o'clock calendar, appearances.
 3                    Robert Furr is reported to be out in
 4     telephone land, are you out there?
 5                    MR. FURR:  Yes.  Good afternoon, Your Honor.
 6     Robert Furr, attorney for the Board of Governors of the
 7     Spencer Condominium.
 8                    THE COURT:  Very well.  Joe Grant?
 9                    MR. GRANT:  Good afternoon, Your Honor.
10     Joe Grant on behalf of Selective Advisors.
11                    THE COURT:  You need to spell your last name
12     for the electronic recorder.
13                    MR. GRANT:  Yes, Your Honor, G-r-a-n-t.
14                    THE COURT:  Did I get your spelling,
15     Mr. Furr?  I didn't.
16                    MR. FURR:  Sir, you did not.  Robert Furr,
17     F-u-r-r.
18                    THE COURT:  And David Haber, are you out
19     there?
20                    MR. HABER:  Your Honor, David Haber,
21     H-a-b-e-r, on behalf of Valencia Estates.
22                    THE COURT:  Very well, and in the courtroom,
23     appearances.
24                    MS. ARMENGOL:  Good afternoon, Your Honor.
25     Johanna Armengol, A-r-m-e-n-g-o-l, for the U.S. Trustee.
```

Page 4

```
 1                    MR. LANGLEY:  And good afternoon,
 2   Your Honor.  David Langley for the ---
 3                    MR. RAMIREZ:  Your Honor --
 4                    THE COURT:  Hello.  Is someone ---
 5                    MR. RAMIREZ:  -- I -- I was having trouble
 6   with the -- the CourtCall.  Juan Ramirez, R-a-m-i-r-e-z,
 7   for NLG.
 8                    THE COURT:  Oh, okay.  Mr. Ramirez, and who
 9   do you represent?
10                    MR. RAMIREZ:  NLG, LLC.
11                    THE COURT:  Okay.  You didn't appear on the
12   list, and welcome.
13                    And now in the courtroom, Mr. Langley, your
14   appearance.
15                    MR. LANGLEY:  Yes, Your Honor, thank you.
16   David Langley here for the debtor, Elizabeth Hazan, and
17   she's here in the courtroom with us today.
18                    THE COURT:  Very well, and we have a number
19   of matters on the calendar, and let's -- let's proceed
20   with them.
21                    Do you have a particular order, Mr. Langley?
22   I see the first matter, 590, was filed by David Haber,
23   that's an objection to confirmation that we have an
24   amended Chapter -- plan, 563, filed by you, Mr. Langley.
25                    MR. LANGLEY:  Yes, Judge.
```

1          THE COURT:  599, objection to confirmation.

2    Then we have 610, objection to confirmation; and then

3    we've got a fee application, 605; and we have a motion to

4    strike a ballot, 607; and I think that pretty well covers

5    it.

6          What are we going to do first, Mr. Langley?

7          MR. LANGLEY:  My preference, Your Honor, if

8    it's okay with you, those first two I think we can deal

9    with together, and I'd like to take those last and just go

10   through the -- the other motions and things that are set.

11         THE COURT:  All right.  Well, tell me which

12   one and we'll talk about it.

13         MR. LANGLEY:  599 --

14         THE COURT:  599 --

15         MR. LANGLEY:  -- that's a motion to strike.

16         THE COURT:  -- objection to confirmation.

17         MR. LANGLEY:  It's a motion to strike an

18   objection to confirmation.

19         THE COURT:  To strike.  Okay.

20         MR. LANGLEY:  And the basis of our motion to

21   strike NLG's objection, Judge, is the ruling in the

22   adversary of November 1 that found that -- and it's quoted

23   in our motion to strike, but that the title to the

24   property, the debtor's property, is forever quieted as to

25   all claims of NLG, and later in your final order, NLG has

Page 6

1   no claim against the debtor, Liza Hazan, and has no

2   standing.

3             So we've got NLG with no claim, no standing,

4   no lien and after that ruling, they filed Docket Entry

5   592, an objection to the disclosure statement, which has

6   already been approved by Your Honor.  I'm sorry, that was

7   the objection to confirmation.

8             They filed an objection to the amended

9   disclosure statement, 578, and then related to this is our

10  motion to strike, 610, which raises that same argument as

11  to NLG's amended objection to confirmation.

12            So since the finding that they have no

13  standing, they have filed three objections, which we

14  believe should all be stricken, 592, 578 and 606, we would

15  request all be stricken.

16            THE COURT:  And, Mr. Ramirez, is that

17  your -- your response?

18            MR. RAMIREZ:  Yes, Judge.  We, as

19  Mr. Langley knows, have appealed the order, and I find it

20  ironic that Mr. Langley would call that a final order

21  because you just filed a pleading with Judge Gayles saying

22  that it was not final, and now he's saying it's final.

23  He's -- he's playing the system here, Judge.

24            THE COURT:  Well, have the -- if the orders

25  are on appeal, was -- was a supersedeas posted?  Is it --

1    are the -- are the orders stayed or are they not?

2                    MR. LANGLEY:  No motion to stay, no bond

3    posted and the appeal has been dismissed.

4                    THE COURT:  Oh, really?  Are you aware,

5    Mr. Ramirez, Mr. Langley says the appeal has been

6    dismissed, is that accurate?

7                    MR. RAMIREZ:  No, the motion ---

8                    MR. LANGLEY:  There's a motion to reinstate

9    the appeal, but the appeal stands --

10                   MR. RAMIREZ:  (Inaudible.)

11                   MR. LANGLEY:  -- as dismissed as of this

12   moment.

13                   THE COURT:  Pardon me, one at a time,

14   Mr. Langley.

15                   Go ahead, Mr. Ramirez.

16                   MR. RAMIREZ:  Yeah, we filed a motion for

17   relief from the dismissal because it was based on an order

18   of a receiver in the state court action now that has been

19   vacated nunc pro tunc, so we anticipate the appeal will be

20   reinstated.

21                   And Mr. Langley called our appeal premature

22   because the order you signed was not a final order, now

23   that -- now he's saying that it is final.  I wish he would

24   make up his mind.

25                   THE COURT:  Well, if the appeal was

Page 8

1    dismissed, that sort of makes it final.

2              Then you say that there's a motion to

3    reconsider the dismissal; is that ---

4              MR. RAMIREZ:  That is correct, that's the

5    motion to reconsider filed timely, and it's been under

6    advisement with Judge Gayles for two or three weeks.

7              MR. LANGLEY:  Judge, I ---

8              THE COURT:  All right.  When you're

9    finished, Mr. Ramirez, we'll hear Mr. Langley's response.

10             MR. LANGLEY:  Yes, Judge.  I refer to it as

11   a final judgment because the title of the document is a

12   final judgment.

13             The finality for appellate purposes is

14   obviously something very different, but you just hit the

15   nail on the head.

16             The order -- order out of the adversary says

17   they have no standing, they have no claim, and until an

18   appellate court says otherwise, that's the law of the

19   case, and they have not moved for a stay and they have not

20   posted a bond.

21             So they have no -- and we cited the Tucker

22   case in our motion that specifically says that without a

23   motion to stay, without an order staying the effect of the

24   order or judgment, they have no standing and they have no

25   right to be objecting to confirmation, and they're raising

Page 9

1    frivolous issues, in any event.

2              And, Judge, as we've mentioned to you a

3    number of times, there are, I believe, five motions for

4    sanctions filed by NLG.  There -- NLG has been the subject

5    of several motions for violating the automatic stay and

6    now after we win the adversary proceeding, they file three

7    more objections in the case, just trying to cause the

8    debtor to incur additional fees, and we need --

9              THE COURT:  These objections are filed --

10             MR. LANGLEY:  -- to ask the Court to ---

11             THE COURT:  -- in the District Court; is

12   that correct?

13             I mean, the -- the appeal was in the

14   District Court; is that correct?

15             MR. LANGLEY:  Yes, and we filed back in

16   November, I believe it was, a motion to dismiss, which was

17   granted in the ---

18             THE COURT:  What's pending over there, is

19   that -- you said that's Judge Gayles?

20             MR. LANGLEY:  Judge Gayles.  We filed a

21   motion to dismiss, he granted it.

22             They have filed a motion for reconsideration

23   of the dismissal, that has not been ruled on, that's

24   pending before Judge Gayles, but ---

25             THE COURT:  Anything scheduled for hearing

1    in the District Court?

2                     MR. LANGLEY:  Not to my knowledge, no.

3                     THE COURT:  How about you, Mr. Ramirez,

4    anything scheduled for hearing?

5                     MR. RAMIREZ:  Not (inaudible).  We're

6    waiting for a ruling on the motion for relief from the

7    dismissal.

8                     THE COURT:  All right.  Well, there's a

9    question of whether or not -- of course, if the

10   reinstatement is granted, we have a different situation

11   then if it is denied.

12                    So we'll hold off ruling on 599 and 607 and

13   610 pending what comes out of the District Court.

14                    Let's move on to the other matters on the

15   calendar.

16                    MR. LANGLEY:  Also, Judge, just related to

17   that is the very last one, 607, that's NLG's motion to

18   strike a ballot, and again, if they have no standing, they

19   have no right to be objecting to a ballot.  The ballot

20   is ---

21                    THE COURT:  607 and 610 --

22                    MR. LANGLEY:  That is their motion to

23   strike.

24                    THE COURT:  -- and 6 -- and 599, all three

25   of them are objections, and if the order is final, then

1    the objections should be overruled.

2                    MR. LANGLEY:  Okay.

3                    THE COURT:  If the order is -- if the

4    District Court takes the matter up, then we have to wait

5    and see what comes out of it.

6                    So as I said, I'm going to defer ruling on

7    those three matters pending a report from the

8    District Court as to how they're going to deal with it.

9                    MR. RAMIREZ:  Thank you, Judge.

10                    THE COURT:  So I'm going to mark it, mark

11   599, 610, and 607 as deferred.

12                    Now, what's next, Mr. Langley?

13                    MR. LANGLEY:  We've got 605, which is a fee

14   application.

15                    THE COURT:  All right.  Tell me about it.

16                    MR. LANGLEY:  This was actually filed some

17   time ago, it's come up a couple of times, you just haven't

18   ruled on it yet.

19                    Fees, net fees, in the amount of

20   $129,377.50, and costs of $813.89.

21                    THE COURT:  Very well.  Has the

22   United States Trustee reviewed this matter?

23                    MS. ARMENGOL:  Johanna Armengol.  Yes, Your

24   Honor.  We do not have an objection with an 80 percent

25   award and a -- a holdback.

Page 12

1              THE COURT:  Anyone else need to be heard on
2    that matter?
3              Very well, then, we'll approve subject to
4    80 percent for fees and a hundred percent on costs.
5              Okay.  What's next?
6              MR. LANGLEY:  Well, Judge, that brings us to
7    the plan and to confirmation.
8              So where we stand with that, setting aside
9    NLG for a moment, the only party that was -- that we had a
10   concern with about this is Valencia represented by
11   Mr. Haber, who's on the phone.
12             We've been speaking with him on and off,
13   including about ten minutes ago, and where we stand on
14   confirmation, Judge, is after two years and all this
15   litigation and successful outcomes on two adversaries, and
16   working out resolutions with just about everybody else,
17   and now very, very, very close with Mr. Haber and his
18   client, we're in a position to be ready for a consensual
19   confirmation, but we're a few days away from some funds
20   being released to the debtor to pay Mr. Haber's client and
21   to be able to say we have effective date payment money
22   sitting there.
23             So what we came here today to request, is
24   that we go through the confirmation process today.  We're
25   working with Mr. Haber to -- we agree that his client is

Page 13

1    due the special assessment of 62,500.  We're a few dollars

2    apart on agreeing on attorney's fees, so we've agreed to

3    submit on paper to Your Honor to work out the attorney's

4    fees.

5              What we're asking for is to give us until

6    Friday to work this out with Mr. Haber and get his okay,

7    get him to remove his objection, which is 590, by paying

8    his client an agreed amount or whatever the Court says,

9    file the affidavits showing -- of the debtor showing that

10   the funds are on hand to pay all the effective date

11   payments, and then some, and administrative expenses, and

12   with everybody's consent, upload an order confirming the

13   plan.

14             THE COURT:  Well, Friday is the 11th and on

15   the 11th I'm getting on a plane to California to go to my

16   granddaughter's graduation, so I'm not sure if the 11th is

17   a workable date.

18             Can that maybe done on the 10th or the ---

19             MS. ARMENGOL:  Your Honor, if I may?

20             THE COURT:  Yes, Madam United States

21   Trustee.

22             MS. ARMENGOL:  Johanna Armengol.

23   Your Honor, we cannot support a conditional confirmation

24   today --

25             THE COURT:  Oh, I would agree.

Page 14

1              MS. ARMENGOL:  -- because the funds are not

2    there, it's putting the cart before the horse.

3              THE COURT:  I agree.  We'll just ---

4              MS. ARMENGOL:  So we -- we would have to

5    come back.

6              THE COURT:  We'll have to roll the

7    confirmation.

8              As I say, if we can do it on the 10th, or

9    else we'll roll it to when I come back, which is -- I

10   think I come back on the 16th, is that right, Sue?

11             ECRO:  You'll be here on the 17th, Judge.

12             THE COURT:  I'll be here on the 17th.

13   So what works for you, Mr. Langley, the 10th or the 17th?

14             MR. HABER:  Your Honor, may I -- this is

15   Mr. Haber.

16             May I be heard on the issue of ---

17             THE COURT:  Certainly, Mr. Haber, you may be

18   heard.  What do you wish to be heard about?

19             MR. HABER:  There is a difference between

20   what Mr. Langley has said and what the Court's prior order

21   is.

22             It says that we have to be paid the $62,500,

23   and it was not timely paid pursuant to stipulation and

24   court order approving same, as well as the declaration,

25   but we're also entitled to interest from the date the

Page 15

1   payment was due, as well as obviously whatever association

2   charges, late charges there are, which they have in the

3   estoppel letter.

4                And then, of course, there's the $14,000 of

5   fees that we've agreed to submit no more than three pages

6   explaining why we feel we should get it, and why they feel

7   they shouldn't have to pay.

8                But I want to make sure Mr. Langley

9   understands, it's not just the $62,500, but it's the other

10  amounts in the estoppel, including interest until the date

11  of confirmation, the late fees to the association, as well

12  as an amount of attorney's fees that Your Honor awards.

13               THE COURT:  What about it, Mr. Langley?

14               MR. LANGLEY:  Well, Judge, up until ten

15  minutes before the hearing started, Mr. Haber and I were

16  just talking about 62.5, plus fees.  So without going back

17  and going through everything he said to us, I'm not sure

18  how significant the interest is.  This is the first I've

19  heard about late fees.

20               THE COURT:  Well, in any event, we're not

21  ready to go forward today anyhow, so it will give you time

22  to work with Mr. Haber --

23               MR. LANGLEY:  Sure.

24               THE COURT:  -- and come up with a number

25  that solves the problem if you're able to do so.

Page 16

1              MR. LANGLEY:  And we can always include that

2    in our three-page submission.

3              MR. HABER:  Your Honor, this is Mr. Haber

4    again.

5              THE COURT:  Yes.

6              MR. HABER:  We have a court order requiring

7    them to pay the interest.  They have received an estoppel

8    that gives them a per diem on the interest.  This is not

9    rocket science, and I don't need to be repeating it to

10   Mr. Langley because he and his client are well aware of

11   the stipulation, and the last three times we were in court

12   they have reconfirmed the same issue that says we're

13   entitled to pay -- be paid the late fees, as well as the

14   interest.

15              And there's been no objection to that

16   previously, and the Court has even admonished Mr. Langley

17   and his client, and said whatever the deal you struck was

18   and the court order approved and your client signed,

19   that's the deal you're stuck with whether you like it or

20   not, good deal, bad deal, that's the deal she made.

21              So to now say, well, we don't know that we

22   have got to pay interest, is just ridiculous.

23              THE COURT:  Well, Mr. Haber, if that's the

24   status of the court order, that is what it is.

25              However, since we're not going ahead with

1   confirmation today, we can wait until we come back and

2   determine whether you resolve your other problems with

3   Mr. Langley, and if you have, and this remains -- still

4   remains a problem and the order says what you say it says,

5   then that would be a further impediment.

6           On the other hand, if Mr. Langley knows

7   something I don't know, you know, perhaps he can discuss

8   that with you, and this is an opportunity for the two of

9   you to get together and come up with whatever number is

10  necessary to solve the problem.

11          MR. LANGLEY:  If nothing else, Judge, we

12  would just like to know the amount.  The letter that I --

13  the last letter I have from Mr. Haber is addressed to me

14  and Ms. Hazan, and it gives that amount, 62,500, it gives

15  the 14,392 in attorney's fees, and $14.04 in costs, and no

16  mention of ---

17          THE COURT:  $14.04 in costs?

18          MR. LANGLEY:  Yes.

19          THE COURT:  What are you doing, Mr. Haber --

20          MR. LANGLEY:  We're going to ---

21          THE COURT:  -- riding first class on the

22  airlines?

23          MR. LANGLEY:  We're going to fight him on

24  that, Judge, but it doesn't mention interest or --

25          MR. HABER:  (Inaudible.)  Your Honor.

1          MR. LANGLEY:  -- it doesn't mention anything

2     else.

3          MR. HABER:  I was driving a NASCAR in

4     Daytona at a hundred fifty-five miles an hour.

5          THE COURT:  Wow.  Well, be careful, we want

6     to make sure you get back to collect your money.

7          MR. HABER:  I am on my way back, and I

8     survived it.  If I can survive confirmation of this case,

9     it will be more difficult than riding at a hundred

10    fifty-five miles an hour, but thank you, Your Honor,

11    for -- for being worried about my safety.

12          THE COURT:  Okay.  So, anyhow, did we select

13    a date, are we doing the 10th or the 16th?

14          MR. LANGLEY:  Your Honor ---

15          THE COURT:  I mean, on the 17th.

16          MR. LANGLEY:  Judge, Ms. Hazan is going to

17    be out of town after your return until May 27th.

18          THE COURT:  Well, by then I've got to go to

19    Jacksonville for another granddaughter's graduation.

20    Let's see, I'm trying to remember when I leave on that.  I

21    think I ---

22          MR. LANGLEY:  The 28th is Memorial Day.

23          THE COURT:  The 28th is Memorial Day and --

24    well, what about the 30th?

25          MR. HABER:  Your Honor, is there any way for

Page 19

1    you to do it by phone?  I have been told you'll extend the

2    hearings by phone when you're out of town, when we're all

3    here.  I would hate to see another month go by when we're

4    already two and a half years in.

5                    THE COURT:  Well, we're not talking about

6    another month, we're talking about a few more days.  I'm

7    back on the 29th or 30th, am I not?

8                    ECRO:  You're back on the 29th.

9                    THE COURT:  29th, and when -- when does

10   Ms. Hazan get in?

11                   MR. LANGLEY:  The 27th, so the 30th would be

12   fine with us.

13                   THE COURT:  30th or the 29th?

14                   MS. HAZAN:  The 30th.

15                   MR. LANGLEY:  30th.

16                   THE COURT:  All right.  Mr. Haber, the 30th

17   work for you?

18                   MR. HABER:  I'm checking right now,

19   Your Honor, hold on one second.

20                   MR. LANGLEY:  And what time would that be?

21                   THE COURT:  Well, let's find out if it's

22   going to work first.

23                   MR. HABER:  I have a mediation that day,

24   Your Honor, but what time, and I will break out and either

25   appear by phone or in person?

1               THE COURT:  Well, what works best for you,

2    morning or afternoon?

3               MR. HABER:  I would either want it first

4    thing in the morning at nine o'clock or at the end --

5    towards the end of the day --

6               THE COURT:  All right.  How about

7    three o'clock?

8               MR. HABER:  -- or first thing after lunch.

9               THE COURT:  How about three o'clock on the

10   30th, does that work?

11              MR. HABER:  That's fine.

12              THE COURT:  Does that work for you,

13   Mr. Langley?

14              MR. LANGLEY:  Yes, Judge, that's terrific.

15   Thank you.

16              THE COURT:  All right.  So then we're set to

17   30 May ---

18              ECRO:  Your Honor, you have an evidentiary

19   hearing at three o'clock.

20              THE COURT:  Oh, I do?  Hold on, and well,

21   then ---

22              ECRO:  We can do the eleven o'clock, if the

23   attorneys are available.

24              MR. LANGLEY:  Would two o'clock work?

25              THE COURT:  Would two o'clock work,

Page 21

1   Mr. Haber?

2               MR. HABER:  Yes.

3               THE COURT:  Do you think we can get it done

4   in an hour?

5               MR. LANGLEY:  Yes.

6               THE COURT:  Two o'clock.  Okay.

7               MR. HABER:  (Inaudible.)

8               THE COURT:  2:00 p.m., and Mr. Langley will

9   draw that order subject to no objection by the

10  United States Trustee.

11              MS. ARMENGOL:  No objection, Your Honor.

12              THE COURT:  Very well.  Okay.  So that takes

13  care of that matter, and 563 is the amended plan, so now

14  they're together.

15              Now, what else do we have to do here today?

16              MR. LANGLEY:  That's it, Judge.

17              THE COURT:  And Ms. United States Trustee,

18  anything to add?

19              MS. ARMENGOL:  Johanna Armengol.  No,

20  Your Honor.

21              THE COURT:  All right, and Mr. Haber?

22              MR. HABER:  This is Mr. Haber.  I would just

23  like to be able to appear by phone on the 30th

24  (inaudible).

25              THE COURT:  Well, that's -- no objection,

Page 22

1    and -- and you know how to do it, you're out there now.

2                    MR. HABER:  Yes.  Thank you.

3                    THE COURT:  How about Mister -- Mr. Grant,

4    anything to add?

5                    MR. GRANT:  Nothing to add, Your Honor.

6    Thank you.

7                    THE COURT:  Mr. Furr?

8                    MR. FURR:  No, sir, Judge.  That time is

9    fine with me.

10                   THE COURT:  Mr. Ramirez?

11                   MR. RAMIREZ:  Nothing, Judge.

12                   THE COURT:  Very well.  Then we'll adjourn

13   this hearing and we'll look forward to seeing you all on

14   the 30th at two o'clock.

15                   MR. LANGLEY:  Thank you, Judge.

16                   THE COURT:  If we don't do it then, we'll do

17   it in 2021 or 2023.

18                   Thank you all.

19                   (Thereupon, the hearing was concluded.)

20

21

22

23

24

25

Page 23

1

2

3                              CERTIFICATION

4

5    STATE OF FLORIDA        :

6    COUNTY OF MIAMI-DADE   :

7

8                 I, Margaret Franzen, Court Reporter and

9    Notary Public in and for the State of Florida at Large, do

10   hereby certify that the foregoing proceedings were

11   transcribed by me from a digital recording held on the

12   date and from the place as stated in the caption hereto on

13   Page 1 to the best of my ability.

14                 WITNESS my hand this 11th day of May 2018.

15

16

17   _____

18                 MARGARET FRANZEN

19           Court Reporter and Notary Public
           in and for the State of Florida at Large
20                 Commission #GG187411
                   April 14, 2022

21

22

23

24

25

## <u>CERTIFICATE OF SERVICE</u>

     I HEREBY CERTIFY that a true and correct copy of foregoing was served via CM/ECF, email or U.S. Mail to the parties on the attached service list as indicated on this 14th day of May 2018.

/s/ Astrid E. Gabbe
The Law Office of Astrid E. Gabbe, P.A.
Florida Bar No. 635383
P.O. Box 4216
Hollywood, FL 33083
Tel. (954) 303-9882
Fax. (954) 983-1427
astridgabbe@gmail.com
*Attorneys for NLG, LLC*

## <u>SERVICE LIST</u>

### <u>Via CM/ECF/Email</u>

Joe M. Grant, Esq. on behalf of Plaintiff Selective Advisors Group, LLC
jgrant@msglaw.com, efile@msglaw.com;
mg197ecfbox@gmail.com;sleary@msglaw.com

David W. Langley on behalf of Plaintiff and Counter-Defendant Liza Hazan
dave@flalawyer.com, emily@flalawyer.com;monica@flalawyer.com

84